In re Detra FOX, Debtor.

Detra FOX, Plaintiff,

v.

Estelle HILL, Defendant.

Bankruptcy No. 87–03694S.
Adv. No. 87–0988S.

United States Bankruptcy Court,
E.D. Pennsylvania.

March 3, 1988.

Philip A. Bertocci, Community Legal Services, Inc., Philadelphia, Pa., for debtor-plaintiff.

Rames J. Bucci, Philadelphia, Pa., for defendant.

Edward Sparkman, Philadelphia, Pa., trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

We herein address two matters consolidated for trial before us: (1) A motion by ESTELLE HILL (referred to hereinafter as "the Defendant"), the "owner" of a premises located at 2357 Wilder Street, Philadelphia, Pennsylvania (hereinafter referred to as "the Premises") under a Real Estate Installment Sale Agreement (hereinafter referred to as "the Agreement") in which the Debtor, DETRA FOX (referred to hereinafter as "the Debtor"), is the purchaser, for relief from the automatic stay, pursuant to 11 U.S.C. § 362(d); and (2) An adversary proceeding in which the Debtor is attempting to determine the extent of the value of the Defendant's alleged "secured claim" against the Debtor's interest in the Premises, pursuant to 11 U.S.C. § 506(a).

The principal issue raised is whether the Debtor may treat an installment land sale contract, admittedly within the definitional and geographical scope of the Pennsylvania Installment Land Contract Law, 68 P.S. § 901, et seq. (hereinafter referred to as "the ILCL"), as a transaction akin to a purchase-money mortgage from the date

that the transaction is entered into, or is required to treat it as an executory contract, pursuant to 11 U.S.C. § 365 of the Code, until the parties go to settlement. We believe that an installment land sale contract in Pennsylvania, even if within the scope of the ILCL, is a hybrid between a secured sale and an executory agreement of sale and/or an executory lease. We therefore conclude that, while such a transaction would ordinarily be treated as an executory contract, the Debtor should have the option of treating the transaction as a secured sale from the date of the transaction forward. The Debtor here has clearly indicated an intention to treat the contract as a secured sale from the outset of this case. We will therefore allow her to do so; rule in favor of the Debtor in the adversary proceeding; value the Defendant's secured claim in the Premises at $5,020.63; and bifurcate the Defendant's claim into a secured claim of $5,020.63 and an unsecured claim of $14,053.11, as the Debtor requests. We shall also deny the Defendant's motion for relief from the automatic stay, conditioned on the Debtor's assumption of the responsibility for paying past taxes and water and sewer liens on the property; performance according to her Plan to pay the secured portion of the Defendant's claim; and her promised additional payment of future taxes, water and sewer bills, and insurance on the Premises. We believe that such performance adequately protects the Defendant's secured interest therein and actually works to the Defendant's benefit to a greater degree than any reasonable alternative.

## B. PROCEDURAL HISTORY

The Debtor filed the underlying Chapter 13 bankruptcy case on July 22, 1987. On September 1, 1987, she filed a Chapter 13 Plan. In her Plan, she opted to treat her obligation to the Defendant as secured by a lien, similar to a purchase-money mortgage, in the amount that she claimed represented the amount of the Defendant's secured claim. In this regard, the Plan provided as follows: (1) It classified the Defendant's claim as an unavoidable secured claim to that extent that it was secured; (2)

It classified all outstanding prepetition local real estate tax and water and sewer charges as administrative claims against the Debtor; and (3) It provided for payments of $132.88 monthly for sixty (60) months, a sum apparently believed by the Debtor to be sufficient to pay the projected unavoidable secured portion of the Defendant's claim and other claims against the Premises secured by liens prior to any secured claim of the Defendant.

The controversy between the Debtor and the Defendant began to unfold in this court on October 14, 1987, when the Debtor moved to hold the Defendant and her counsel in contempt and sought damages for violation of the automatic stay, per 11 U.S.C. § 362(h). This action was prompted by the filing by the Defendant's counsel, on September 13, 1987, without prior relief from the automatic stay, of a Petition for Sanctions against the Debtor in state court. The Petition was filed to enforce a pre-petition state court Order of July 15, 1987, requiring the Debtor to pay $300.00 monthly into escrow, entered in the course of the Defendant's action to obtain possession of the Premises due to the Debtor's alleged violation of the terms of the Agreement.

At a hearing on November 12, 1987, we ascertained that the Defendant's counsel, acting doubtless out of unfamiliarity with bankruptcy law principles rather than malice, was still pressing the Petition for Sanctions in state court. In a Memorandum and Order of December 7, 1987, we held that counsel's pursuit of this Petition prior to obtaining relief from the stay entitled the Debtor and her counsel to relief under 11 U.S.C. § 362(h), and we required the Defendant's counsel to remit $50.00 to the Debtor and $200.00 to her counsel. *See In re Wagner*, 74 B.R. 898, 902–05 (Bankr.E.D.Pa.1987); and *In re Demp*, 23 B.R. 239, 240 (Bankr.E.D.Pa.1982) (modest penalties imposed for modest and relatively innocent violations of automatic stay). *Compare In re Aponte, Aponte v. Aungst*, 82 B.R. 738 (Bankr.E.D.Pa.1988) (penalties totaling $13,080.00 imposed for intentional, pro-

longed, and egregious violations of automatic stay by landlord).

Responsive to our statement that relief from the automatic stay was a prerequisite to pursue her Petition for Sanctions in state court, the Defendant filed, on November 19, 1987, the § 362(d) motion which is presently before us.

This filing set off two responsive filings from the Debtor, on November 25, 1987: (1) A Proof of Claim on behalf of the Defendant in the amount of $19,073.74, apparently calculated to be the balance due under the Agreement; and (2) The instant adversary proceeding, seeking to determine the value of the Defendant's interest in the interest of the Debtor's estate in the Premises pursuant to 11 U.S.C. § 506(a), i.e., to determine how much of this claim was in fact secured. The Defendant responded with an Answer to the Adversary Complaint and something which was designated as a "Proof of Claim," but which appeared, in its text, to merely request relief from the stay to pursue the underlying state court action and the Petition for Sanctions filed therein.

The foregoing set the stage for the consolidated trial of the matters before us, continued by agreement of the parties until January 28, 1988. The Defendant, presently a resident of South Carolina, took the witness stand and gave a homespun, stream-of-consciousness account of her side of the story, which was not interrupted by either questions from her counsel or objections from the Debtor's counsel, and only occasionally by questioning from the court. Upon completing her testimony, the Defendant abruptly left without hearing the Debtor's testimony, reportedly to attend a sister's funeral.

The Debtor, a single parent of five children, then took the stand. Her testimony was somewhat more focused, but concluded with her bursting into tears at the end of the rather delicate cross-examination by the Defendant's counsel. We were left with the distinct impression that neither party had any concept of the difficult legal issues presented by their controversy.

Since one of the matters before us was a § 362(d) motion, we were obliged to expedite the briefing and decision-making. We therefore required counsel to submit Briefs simultaneously on February 16, 1988. The Debtor's counsel submitted a 36–page opus directed at convincing us that our view of the case articulated at trial—that the Agreement must be viewed as an executory contract—was erroneous. The Defendant submitted a six-page "Memo," one and a half pages of which contain a number of presumably relevant tidbits under the heading "Other Points of interest suggested." No analysis of bankruptcy law principles was included, and the only bankruptcy cases cited were those mentioned at trial, *In re W. & L. Associates, Inc.,* 71 B.R. 962 (Bankr.E.D.Pa.1987); and *In re Booth,* 19 B.R. 53 (Bankr.D.Utah 1982), and no analysis of either case was provided. Counsel punctuated this brief with a similarly homespun "Rebuttal to Fox's Brief," which reached us on February 22, 1988. *But see In re Jungkurth,* 74 B.R. 323, 325–26 (Bankr.E.D.Pa.1987) (counsel should not file unsolicited Reply Briefs.)

We are therefore presented with two litigants who entered into a transaction equally in ignorance of their potential rights should disputes arise and who presented equally colorful and uncontrived, and yet different, versions and viewpoints on the disputes which have arisen. One party is represented by counsel extremely conversant with bankruptcy law principles, who appears to be striving almost too hard to utilize those principles to his client's best advantage. The other, displaying no familiarity with bankruptcy law principles, urges us to do "justice" to his client or, more accurately, relegate this matter to the state courts where he feels more confident that "justice" will be done to his client.

The result which we reach, while having sound basis in bankruptcy law, was reached largely by considering the alternatives and, by process of elimination, arriving at a result which appears to achieve more for each of the parties and better serves the public interest than any of the other alternatives. Because one of the matters before us is an adversary proceed-

ing in which some factual determinations must be made, we shall present our result in the form of Findings of Fact, Conclusions of Law, and a Discussion.

C. FINDINGS OF FACT

1. On September 18, 1985, the parties entered into the Agreement in issue relative to the Premises. The relevant terms of the Agreement are as follows:

a. The purchase price recited was $20,000.00.

b. The Debtor was to pay $650.00 down and $300.00 a month towards this purchase price.

c. The $300.00 monthly payments were to be applied first to principal and interest at ten (10%) percent; then to one-twelfth of charges for annual taxes and insurance; then to repairs and assessments, for which the purchaser was assuming responsibility; and the remainder to reduction of the $19,350.00 remaining principal.

d. When the principal balance was reduced to $15,000.00, the "purchaser" was entitled to go to settlement and the "owner" would take a purchase-money mortgage for fifteen (15) years at ten (10%) percent interest.

2. The Premises consists of a corner storefront and a three bedroom apartment above it.

3. The store and apartment had both been utilized by the Defendant until she moved out of the Premises in late 1983 or early 1984. Thereafter, the Defendant's son took over the store and apartment for several months. The property was vacant from late 1984 or early 1985 until the Debtor moved into it in September, 1985. The store is presently not in use, and the sole purpose of the Debtor's entering into the transaction was to obtain a residence for her family.

4. The Defendant turned down an offer to purchase the property for $10,000.00 just prior to entering into the Agreement with the Debtor.

5. The Debtor is a single parent of five children ranging in ages from twenty years to thirteen months. She is totally unso-phisticated in real estate transactions and was desperate for a home for her large family when she entered into this transaction.

6. The Defendant is an equally unso-phisticated businessperson. Even when the Debtor remitted payments (see Finding of Fact 10, *infra*), she made no effort to make repairs or pay taxes or purchase insurance for the Premises after she moved out of the Premises because, in her mind, it was no longer necessary for her to do so.

7. The Premises deteriorated severely between the time that the Defendant moved out of it in 1983, and the time that the Debtor moved into it in September, 1985, probably because, after the Defendant left, neither the Defendant's son nor the Defendant accepted any responsibility for its maintenance.

8. Unknown to the Debtor, as of September, 1985, when the Debtor signed the Agreement and moved into the Premises, the Premises did not have an operable heating system, had only a thin layer of coating on the roof, and had severe plumbing problems.

9. The aforesaid conditions became manifested only after the Debtor began living in the Premises in the fall and winter of 1985–86. The lack of heat became obvious when it got cold. Water leakage quickly developed throughout the apartment. Gross pipe leaks quickly developed in the basement.

10. The Debtor paid the $650.00 initial payment and $300.00 monthly thereafter on a reasonably regular basis to the Defendant's counsel or the Defendant herself through July, 1986.

11. Throughout late 1985 and into 1986, the Debtor complained continually to the Defendant and/or her counsel about the pre-existing defective conditions in the Premises.

12. The Debtor attempted to hire a repairman to fix the heater. She purchased a new thermostat and switch but this failed to make it to work, and she could not afford more extensive repairs.

13. The Defendant acknowledged her responsibility for the plumbing and roof repairs by sending a handyman to the property and advising the Debtor to contact the roofer who had allegedly performed the last roof work. However, these measures were totally inadequate and, principally because of the pre-existing conditions described in Finding of Fact 8 *supra,* particularly the lack of heat, the Premises has deteriorated to the point where its present condition is such that it would almost certainly be declared unfit for human habitation if the City Department of Licenses and Inspections were to inspect it, which has not been done.

14. On April 15, 1987, Israel Silver, a realtor, prepared a report stating that, in his opinion, the fair market value of the Premises at that time was $7,000.00.

15. No other evidence as to the value of the Premises was given by any other party, and we therefore find that the value of the Premises as of Confirmation, scheduled for a hearing on March 17, 1988, will be deemed to be $7,000.00.

16. As of January, 1988, there were delinquent tax liens and water and sewer liens amounting to $1,545.90 and $433.47, respectively, or a total of $1,979.37, against the Premises, dating from 1984 to date. Current taxes continue to accrue at the rate of about $160.00 and $225.00 annually, respectively.

## D. CONCLUSIONS OF LAW

1. The Debtor, as a vendee under a Pennsylvania installment land sale contract regulated by ILCL, dated September 18, 1985, is entitled to treat herself as the equitable owner of the Premises and the Defendant as a legal owner having only a secured interest in the Premises as of September 18, 1985, provided that she elects to do so prior to the Confirmation.

2. Having elected to treat the transaction as effecting an equitable sale as of September 18, 1985, prior to Confirmation, the Debtor is entitled to invoke 11 U.S.C. § 506(a) to bifurcate the Defendant's claim into a secured claim, equal to the interest of the Debtor's estate in the premises, and an unsecured claim for the balance.

3. Given the $7,000.00 value of the Premises and the prior liens of $1,979.37 against it, the Defendant's valid secured claim against the interest of the Debtor's estate in the Premises is $5,020.63.

4. Provided that the Debtor maintains her Plan payments, which seem sufficient to satisfy this secured claim, and, in addition, accepts responsibility for the prior tax and water and sewer liens; pays interest at ten (10%) percent to the Defendant for deferral of payment of her claim; and maintains future payments for taxes, water and sewer rents and insurance, the Defendant's interest in the Premises are adequately protected.

5. The Debtor is entitled to judgment in her favor in the Adversary proceeding on these conditions, and the Defendant's motion for relief from the automatic stay must be denied.

## E. DISCUSSION

### 1. SECTION 365 SHOULD BE VIEWED AS A DEBTOR'S TOOL, AND NOT AS A MEANS OF DEPRIVING A DEBTOR OF A RESIDENCE

The novel and determinative issue presented by the matters before us is whether the Debtor is entitled to treat the Agreement in issue, the installment land sale contract of September 18, 1985, as a security device rather than as an executory contract. Although this is a close issue, and one on which the authorities are split, we are inclined to allow the Debtor to do so, principally because we believe that 11 U.S.C. § 365 should be conceptualized as a tool of the Debtor, to benefit the estate at the Debtor's option wherever possible, and should rarely, if ever, be used as a basis to deprive a consumer-debtor of a residence.

We previously discussed the impact of § 365 in *W. & L. Associates, supra; In re Grant Broadcasting of Philadelphia (Fourth Opinion),* 71 B.R. 891 (Bankr.E.D. Pa.1987); *In re Sudler,* 71 B.R. 780 (Bankr.E.D.Pa.1987); and *In re Adams,* 65 B.R. 646 (Bankr.E.D.Pa.1986). In *W. & L. Associates,* we determined that an unconsummated agreement of sale in which the debtor was a vendor could be rejected de-

spite the fact that the vendee appeared at settlement and offered the full payment price. There, we held that we were "inclined to interpret § 365 broadly, at least in a debtor's behalf, ..." 71 B.R. at 963.

However, in *Sudler* and *Adams,* the debtors were tenants rather than vendors. There, we reiterated an unwillingness to allow the lessor of a residence to the debtor to utilize § 365 as a means of rejecting a lease and thereby dispossessing a debtor-tenant of a home solely because the latter had filed for bankruptcy. Thus, we explained that the trustee's rejection of a residential lease, per 11 U.S.C. § 365(d)(1), merely constituted an abandonment of the leasehold to the tenant rather than effecting a termination of the lease. *Accord, In re Knight,* 8 B.R. 925, 928–29 (Bankr.D. Md.1981).[1]

Finally, in *Grant Broadcasting,* we offset the force of these holdings in favor of a debtor-tenant's interests. There, joining in substantial part Judge Fox's opinion in *In re Borbridge & DeSantis,* 66 B.R. 998, 1001–02 (Bankr.E.D.Pa.1986), we held that a landlord could invoke § 362(d) to obtain relief from the stay and pursue a state court eviction action if the debtor-tenant failed to provide adequate protection to the landlord's interests. Thus, we declined to follow contrary decisions in, *e.g., In re Wheeling–Pittsburgh Steel Corp.,* 54 B.R. 385, 390–91 (Bankr.W.D.Pa.1985); and *In re Sweetwater,* 40 B.R. 733 (Bankr.D.Utah 1984). In so doing, we refused to relegate landlords to invocation of § 365 for their remedies against errant tenants and deemphasized § 365 as the controlling Code section in sorting out residential-lease relationships of debtor-tenants.

It is upon this backdrop that we consider the issue of whether a Pennsylvania real estate installment contract can be conceptualized as a security device, controlled by principles of 11 U.S.C. §§ 1322 and 506, instead of a lease controlled by 11 U.S.C. § 365.

## 2. CASES SUPPORTING THE VIEW THAT REAL ESTATE INSTALLMENT SALE CONTRACTS CAN BE CONCEPTUALIZED AS SECURITY DEVICES

The seminal case supporting the position of the Debtor that installment land sale contracts can be conceptualized as security devices is Judge Mabey's decision in *Booth, supra.* There, the court had before it a motion by vendors of realty who sought to compel the debtor, a broker and dealer in realty, to assume or reject his contract with them, pursuant to 11 U.S.C. § 365(d)(2). The analysis of Judge Mabey, in denying the motion, emphasized the benefit of the land sale contract in issue to the estate of the debtor. Sections 365(i) and (j) of the Code, which protect the possessory rights of non-debtor vendees of executory contracts for the sale of realty, were perceived as providing protection for certain particularized parties, and Judge Mabey refused to carry over this protection to situations where the debtor was a vendee and no particularized protection for the non-debtor was present.[2] Observing that requiring debtors to assume or reject agreements of sale provided them less flexibility than allowing debtors to deal with liens under plans, Judge Mabey denied the § 365 motion before him and allowed the debtor-

---

**1.** Similar reasoning would apply in consideration of residential leases under § 365(d)(2), but would not apply in consideration of nonresidential leases (our statements in *Adams,* which did not involve residential realty, were dicta). By operation by 11 U.S.C. § 365(d)(4), nonresidential leases must be assumed within sixty (60) days or any extension of time allowed by the court, or the lease is deemed rejected and the leasehold must be "immediately surrendered." While we held, in *Adams, supra,* that the terms "immediately surrender" give the landlord only a right to obtain imminent relief from the stay to obtain possession in state court pursuant to

§ 362(a), nevertheless this language does state that the lease is terminated and that the tenant must vacate the premises if the landlord chooses to attempt to evict the tenant in a state court action after obtaining relief from the stay. No such provision applies to residential leases.

**2.** This Congressional attention to the possessory rights of residential tenants is consistent with establishing the sanctity of a party's residence, which we believe is consistent with our interpretation of 11 U.S.C. § 365(d) expressed at pages 294–95 *supra.*

vendee to treat the agreement as a sale secured with a lien.

While the reasoning of *Booth* has not been uniformly accepted, a considerable number of cases have followed it. *See, e.g., In re Thurmond,* 46 B.R. 723 (D.Ore. 1985); *In re Adolphsen,* 38 B.R. 780 (D.Minn.1983); *In re Rehbein,* 60 B.R. 436, 440–42 (9th Cir.Bankr.App.1986) (debtor was vendor); *In re Johnson,* 75 B.R. 927, 929–30 (Bankr.N.D.Ohio 1987); *In re Pribonic,* 70 B.R. 596, 602–06 (Bankr.W.D.Pa. 1987) (debtors were vendors); *In re Bertelson,* 65 B.R. 654, 655–58 (Bankr.C.D.Ill. 1986); *In re Jones,* 54 B.R. 697, 698–700 (Bankr.E.D.Ark.1985); *In re Britton,* 43 B.R. 605, 607–08 (Bankr.E.D.Mich.1984); *In re Love,* 38 B.R. 771, 774–76 (Bankr.D. Mass.1983) (applying Pennsylvania law); *In re Flores,* 32 B.R. 455, 459–60 (Bankr.S. D.Tex.1983); and *In re Cox,* 28 B.R. 588, 590–91 (Bankr.D.Idaho 1983). *Cf. In re Polay,* 66 B.R. 543, 545 (Bankr.E.D.Pa. 1986) (former Chief Judge Goldhaber of this court holds that facts of a case involving a lease-purchase of realty are "analogous" to a mortgage foreclosure situation).

### 3. OUR RESPONSES TO CASES WHICH SUPPORT THE VIEW THAT SUCH CONTRACTS MUST BE VIEWED AS EXECUTORY CONTRACTS AND THEIR REASONING

A number of decisions almost equal to the foregoing list of cases endorsing its reasoning have rejected the reasoning of *Booth. See, e.g., In re Speck,* 798 F.2d 279 (8th Cir.1986); *Shaw v. Dawson,* 48 B.R. 857, 859–61 (D.N.M.1985)); *In re Scanlon,* 80 B.R. 131, 132–35 (Bankr.S.D.Iowa 1987) (involved § 506 motion similar to that there); *In re Buchert,* 69 B.R. 816, 819–21 (Bankr.N.D.Ill.1987); *In re Waldron,* 65 B.R. 169, 170–75 (Bankr.N.D.Tex.1986); *In re McCallen,* 49 B.R. 948, 952 (Bankr.D. Ore.1986); and *In re Anderson,* 36 B.R. 120, 124–25 (Bankr.D.Hawaii 1983). The courts declining to follow *Booth* have relied upon the following reasoning: (1) State law is controlling in characterization of land sale contracts, and the law of the particular jurisdiction in which the respective courts were sitting was held to treat them as executory contracts. All of the above decisions so hold except perhaps *McCallen,* and the *Waldron* opinion discusses this issue at length; (2) As contracts not wholly performed on one side, land sale contracts fall squarely within the traditional definition of an "executory contract" proffered by Professor Vern Countryman in his classic law review article, *Executory Contracts in Bankruptcy: Part I,* 57 MINN.L.REV. 439, 450–62 (1973). This article is cited with approval as an authority for the result reached in *Scanlon, Buchert, Waldron,* and *Shaw, supra.* (3) The presence of 11 U.S.C. §§ 365(i) and (j), which permit a non-debtor vendee of a contract for the sale of realty to treat the contract as terminated or remain in possession as long as payments, with offset for damages, are made, and specifically designate such contracts as "executory." It is argued that Congress's references to land sale contracts as executory in these sections requires them to be treated as such in all contexts. This argument is advanced with particular force in *Shaw;* and (4) The Debtor should not be permitted "to change an ugly duckling (agreement of sale) into a beautiful swan (mortgage)" by the utilization of the bankruptcy court as a "fairy godmother." *Anderson, supra,* 36 B.R. at 124. This sort of simile should appeal to the Defendant's counsel, who likens the Debtor's position to that of "a small child [who should know] better than to abuse a cookie jar." Rebuttal to Fox's Brief, at 4.

Each of these arguments has some appeal, but, ultimately, we find none of them to be convincing.

### a. INTERPRETATION OF 11 U.S.C. § 365 IS A FEDERAL QUESTION. HOWEVER, PENNSYLVANIA LAW DOES TREAT INSTALLMENT LAND SALE CONTRACTS AS SECURITY DEVICES IN SEVERAL CONTEXTS.

■ The first issue, whether state or federal controls, is disputed by many of the courts which decline to hold that installment land sale contracts must be considered as executory contracts. *Booth* relies solely upon federal law as the basis for

its result. Many of the cases following *Booth's* result do so upon an analysis of state law which leads them to conclude that, under the law of that particular state, installment land sale contracts are more like security devices such as purchase-money mortgage contracts than leases. *E.g., Pribonic, Bertelsen, Britton,* and *Love, supra.*

Two of the cases which emphasize the significance of state law, *Pribonic* and *Love,* interpret Pennsylvania law. Both cases cite to a series of federal and state court cases in which courts construing Pennsylvania law have held that execution of an agreement of sale for land vests the vendee with equitable title to the realty purchased immediately upon its execution and prior to settlement, *e.g., McCannon v. Marston,* 679 F.2d 13, 15 (3d Cir.1982); *Vogel v. Northern Assurance Co.,* 219 F.2d 409, 411 (3d Cir.1955); *Allardice v. McCain,* 375 Pa. 528, 535, 101 A.2d 385, 389 (1953); *Anderson Contracting Co. v. Daugherty,* 274 Pa.Super. 13, 20–23, 417 A.2d 1227, 1230–31 (1979); and *Long John Silver's, Inc. v. Fiore,* 255 Pa.Super. 183, 189–90, 386 A.2d 569, 572 (1978).

The citations to *Vogel, Allardice,* and *Fiore,* all of which interpret agreements of sale which are clearly not installment land sale contracts, establish an interesting point pertinent by analogy to consideration of such contracts. If an agreement of sale transfers equitable title, such that the risk of loss which must be insured passes to the vendee, then it would seem that an installment-sale contract, which is merely an agreement of sale in which the settlement date is postponed, should do so.

The results in the *McCannon* and *Anderson* cases are, we believe, even more pertinent. In *McCannon,* the court considered an attempt by a bankruptcy Trust-ee of a debtor hotel to avoid an unrecorded agreement of sale of a condominium unit in the hotel to a resident. After holding that the resident had a legal ownership of the unit as a result of signing the agreement of sale, the court subsequently considered the impact of § 365(i). 679 F.2d at 17–18. Focusing upon the "evidence of congressional concern for purchasers in possession" which we believe is pivotal in interpreting the applicability of § 365, the court reversed an effort by the Trustee to avoid the contract and evict the resident.

In *Anderson,* the court held that a "notice of intention to foreclose," as required by 41 P.S. § 404, must be dispatched to a vendee under an installment land sale contract before the vendee's rights could be ter~inated. Thus, for purposes of that act, s~ .h a contract was held to come within the definition of a "residential mortgage," pursuant to 41 P.S. § 101(f).

The Debtor, in her brief, also points to the fact that the Pennsylvania legislature chose to extend the protections of the Homeowners Emergency Assistance Act, 35 P.S. § 1680.401c, et seq., which provides "emergency mortgage assistance payments," to vendees under installment land sale agreements. 35 P.S. § 1680.401c(a).

On the other hand, the Debtor conveniently fails to mention that the ILCL itself, on its face, indicates that contracts within its scope are "executory in nature," 68 P.S. §§ 902(1), (3), and refers to contracts within its scope as "executory." 68 P.S. § 903(a)(1).[3] Neither the *Pribonic* nor the *Love* decision, which support the *Booth* result on the basis of Pennsylvania state law, cite to the ILCL or to this language.[4]

However, we note that, in *Johnson, supra,* 75 B.R. at 929, 930, the court was presented with interpretation of an Ohio

---

**3.** It should be noted that, by its terms, the ILCL only applies to dwellings in first-class cities and second-class counties. 68 P.S. § 903(a)(2). Present state law definitions of such government units, 16 P.S. § 210(2) and 53 P.S. § 101, respectively, and population figures, confine the applicability of these laws to Philadelphia City and County and Allegheny County, which embraces Pittsburgh. Here, the ILCL applies because the Premises is in the City of Philadelphia.

**4.** This omission is justified in *Love,* since that case involved realty located in Butler County, in which the ILCL is not effective. See page 297 n. 3 *supra.* However, *Pribonic* involved property situated in White Oak Borough, Allegheny County. *See Rusiski v. Pribonic,* 511 Pa. 383, 386, 515 A.2d 507, 508 (1986).

installment sales contract law, which, similar to the ILCL, expressly designated such contracts as "executory." The *Johnson* court nevertheless held that this designation was "not determinative of the issue for federal bankruptcy purposes." *Id.* at 930.

We agree with this observation of the *Johnson* court. There is, first, no indication that the Pennsylvania legislature, enacting the ILCL in 1965, could have had any intention to fix a designation of such contracts as "executory" for purposes of any bankruptcy law, let alone to touch upon the elements of 11 U.S.C. § 365, which was enacted thirteen years later. Secondly, the language of the ILCL is something less than a pronouncement that such contracts are executory. Rather, this term is used in an offhand manner in the midst of provisions indicating that the purpose of the ILCL is to protect the buyer. 68 P.S. § 902(2). Finally, we observe that the Supremacy Clause would prevent the Pennsylvania legislature from fixing the status of such contracts in a manner inconsistent with the Bankruptcy Code.

In any event, we believe that the Pennsylvania courts, as evidenced by *Anderson, supra,* and the Pennsylvania legislature, as evidenced by the enactment of 35 P.S. § 1680.401c(3), have consistently extended and interpreted this state's laws to benefit citizens of the Commonwealth in efforts to retain their residences. In so doing, the rights of vendees of installment land contracts have been expanded. This is the same element of preserving the rights of "purchasers in possession" which pervades the decision in *McCannon, supra,* 679 F.2d at 17–18.

It is this same element which we believe must be recognized in interpretation of § 365, as articulated at pages 294–95 *supra.* Therefore, to the extent that it is pertinent, Pennsylvania law appears consistent with the concept of releasing vendees under land sale contracts from the confines of § 365. However, along with the *Johnson* and *Booth* courts, we believe that the significance of state law pales in comparison with the overriding Bankruptcy Code policy of protecting the property of debtors' es-

tates. In the case of low-income consumer debtors such as the Debtor here, clearly the most valuable and often the most fragile of their property is their residence. Such debtors should be given every opportunity to preserve their residences, apart from the confines of § 365, if necessary. Therefore, we respectfully disagree with those cases which have felt compelled to consider installment land sale contracts as executory contracts within the scope of § 365 on the basis of state law.

It is, moreover, our observation that the laws of most states consider installment land sale contracts as hybrids, neither quite the same as security devices nor the same as pure leases. We note that a long line of cases, in Pennsylvania and elsewhere, has treated sales in the form of leases as disguised sales and hence as "true sales." *See e.g., Jones v. Action TV Rental, Inc.,* C.A. No. 79–1535 (E.D.Pa. June 3, 1980); *Bonzcek v. Pascoe Equipment Co.,* 304 Pa.Super. 11, 19–21, 450 A.2d 75, 79–80 (1982); and *Chandler v. Riverview Leasing, Inc.,* No. 1984–CE–2736 (North Co. C.P. May 15, 1986) (per VAN ARTWERPEN, J.). Moreover, in *Davis v. Colonial Securities Corp.,* 541 F.Supp. 302 (E.D.Pa. 1982), *appeal dismissed,* 720 F.2d 661 (3d Cir.1983), an installment land sale contract was so treated by our district court. *See also Gulf Homes, Inc. v. Gonzales,* 139 Ariz. 1, 676 P.2d 635 (1983).

We are therefore inclined to give debtors the choice of treating such hybrid transactions as "true sales" in which the vender retains a security interest in the premises in certain circumstances.

b. THE FUNCTIONAL NATURE OF THE COUNTRYMAN DEFINITION OF EXECUTORY CONTRACTS SUGGESTS THAT IT SHOULD NOT BE UTILIZED TO CONCLUDE THAT THE PARTIES' AGREEMENT MUST BE TREATED AS AN EXECUTORY CONTRACT, GIVEN THAT THE PRACTICAL EFFECT OF SUCH A DETERMINATION WOULD BE DETRIMENTAL TO ALL PARTIES INVOLVED.

The second reason articulated for considering such contracts as executory is their

falling within the purported controlling Countryman definition of executory contracts, i.e., embracing all contracts not fully performed on either side. However, as we suggested in *W. & L., supra,* blind adherence to the language of the Countryman definition, while ignoring the functional context in which the definition was offered, can be deceiving. In *W. & L.,* we also pointed out that the general definition of an "executory contract" is even broader than the Countryman definition, i.e., including contracts not fully performed on *either* side, 71 B.R. at 965. *See also In re Royal Oxford Mushroom Products, Inc.,* 45 B.R. 792, 794 (Bankr.E.D.Pa.1985); and *In re Norquist,* 43 B.R. 224 (Bankr.E.D.Wash. 1984). (Contract which requires substantial performance by either party, other than payment of money, is executory).

Certainly, the Agreement in issue has not been fully performed on either side and is, therefore, within the strict confines of the Countryman definition. However, especially if the *Oxford Mushroom* modification of the definition is accepted, any contract that requires any performance by either party would fall within the confines of § 365. We note that Williston states that "[a]ll contracts to a greater or less extent are executory. When they cease to be so, they cease to be contracts." 1 WILLISTON ON CONTRACTS, 27 (3d ed. 1957). If Williston's definition is applied, then *all* contracts would be within the scope of § 365.

In *W. & L., supra,* we ultimately held that contracts from which the debtor's estate has received full benefit pre-petition were excluded from the scope of § 365. 71 B.R. at 965. This, we believed was consistent with Countryman's observation that such contracts should be excluded from the definition of "executory contracts" because "[t]he estate has whatever benefit it can obtain from the other party's performance and the trustee's rejection would neither add to nor detract from the creditor's claim or the estate's liability." 57 MINN.L.REV. at 457. Judge Mabey, in *Booth,* similarly emphasized this functional aspect of the Countryman definition when he reasoned that the index to whether a contract is executory is whether its acceptance or rejection will benefit the debtor's estate. 19 B.R. at 55. Therefore, in *W. & L.,* where a finding that the agreement of sale was executory benefited the estate, we so found. Here, there would be no benefit to the Debtor's estate—nor, as we shall show, the interests of the Defendant, either—in declaring the contract executory.

If we were to declare the contract executory, the Debtor would be faced with the choice of accepting a contract to pay $20,000.00 for a premises worth $7,000.00 or rejecting the contract. Given the fact that she is now painfully aware of the bad deal that she made in agreeing to pay such an exorbitant sum for the Premises, there can be little question that, required to make a choice, she would reject the contract.

If the Debtor did proceed to reject the Agreement, we would then place the Defendant in a classic no-win situation, which we shall term, for want of a better one, the "slumlord's dilemma." [5] The Debtor's status, upon rejection, would revert to that of a pure tenant, at least at sufferance, liable for such rent as would be due under a lease. *See Mack v. Fennell,* 195 Pa.Super. 501, 504–05, 171 A.2d 844, 846 (1961). However, the premises obviously has had, since the date of the bankruptcy filing, and continues to have, such serious defects, including lack of heat, engulfing roof-leaks, and severe plumbing problems, as to be considered legally uninhabitable despite the Debtor's need to remain there for want of an alternative. Under Pennsylvania law, the Defendant would hence be in complete breach of her implied warranty of habitability. *See Pugh v. Holmes,* 486 Pa. 272, 291–92, 405 A.2d 897, 906–07 (1979). This would appear to excuse the Debtor from

---

5. We wish to emphasize that, using this term, we do not characterize the Defendant as a "slumlord" or "slumlady." We have no evidence that she owns any other rental properties and her failure to maintain the Premises appears to have arisen from a combination of lack of funds and a misunderstanding of her responsibilities as a vendor under an installment land sale contract.

paying rent under any lease and to provide a complete defense to the Debtor in any action by the Defendant to recover possession of the Premises. 486 Pa. at 292, 405 A.2d at 907. The Defendant would thus be unable to legally terminate the Debtor's lease under controlling state law and, if it were determined the Debtor had paid all rent legally due, which is likely due to the fact that the Premises' condition is and has been, since July, 1986, in complete breach of the implied warranty of habitability, the Defendant would be unable to evict the Debtor pursuant to an applicable Philadelphia City ordinance as well. PHILADELPHIA CODE, § 9–804(1)(a). She would also be proscribed, under City ordinance, from renting it to any other prospective tenant. *Id.* at § 9–804(1)(b).

The Defendant would be unable to obtain relief from the automatic stay as long as the Defendant was adequately protected by such periodic rental payments as were legally due to her. *In re Dabney,* 45 B.R. 312, 313–14 (Bankr.E.D.Pa.1985). However, as Chief Judge Twardowski has ruled in an unreported Order of this Court in *In re Adam,* Bankr. No. 84–02019T (Bankr.E. D.Pa. Feb. 28, 1985), a debtor-tenant need not render *any* performance to adequately protect a landlord as long as the premises is unfit for human habitation. Since the warranty of implied habitability cannot be waived, *Fair v. Negley,* 257 Pa.Super. 50, 55–56, 390 A.2d 240, 243 (1978), the Defendant's claim that the Agreement placed the burden of making repairs upon the Debtor would be unavailing to her.

The end result of this scenario is that the Defendant could not evict the Debtor, at least as long as the Chapter 13 bankruptcy remained pending; would receive no rent; and hence would be unable to change the status quo unless she invested new capital to repair the Premises and render it no longer legally uninhabitable. As the Defendant appears unwilling to make any investment in the Premises, it appears that the end result would be that the Defendant would receive *no* return whatsoever on the Premises. Moreover, this set of circumstances would not benefit the health and living environment of the Debtor and her family, as they would remain in an unfit premises which would continue to deteriorate. Further, this result of further deterioration of the Premises would not serve the public interest of preserving and upgrading the low supply of housing stock available to low-income residents of the City.

Neither party is blameless in creating this scenario. The Debtor was naive in agreeing to pay a price far in excess of the value of the Premises and not inspecting it carefully before she moved in. While her initial payments of rent and willingness to pay some amount for the Premises now convince us of some measure of good faith on her part, her decision to abruptly stop making all payments after July, 1986, suggests a motivation of financial expediency rather than a sudden awakening to her legal rights. More constructive measures on her part in response to her predicament would have been paying her rent into escrow until repairs were made, thus giving the Defendant a monetary incentive to make repairs, or utilizing the procedure of "repair and deduct." *See Pugh, supra,* 486 Pa. at 293–94, 405 A.2d at 907–08.

However, the Defendant is clearly not without fault either. She allowed the home to deteriorate. She attempted to sell it with hidden defects, which also could have prompted a cause of action against her which would have possibly resulted in a substantial reduction of the $20,000.00 purchase price in any event. *See In re Humphreys Pest Control, Inc.,* 80 B.R. 687, 696–97, 698 (Bankr.E.D.Pa.1987); and *In re Dinkins,* 79 B.R. 253, 258–59 (Bankr.E.D. Pa.1987). She and her agent-counsel ignored the Debtor's complaints about the condition of the premises and/or took woefully inadequate measures to effect repairs. Further, she breached the Agreement by failing to apply any of the payments made from September, 1985, to July, 1986 (almost a year's time), to taxes, water and sewer rents, or insurance, as the Agreement required. She simply and totally neglected all of her responsibilities.

The Debtor's proposal to purchase the property at its present value is clearly a preferable solution, from the standpoint of

all interested parties, to any practical alternative. The Defendant is thereby extricated from the "slumlord's dilemma." She will receive over $5,000.00 in deferred payments, plus interest which we will establish at ten (10%) percent and result in an additional sum of about $1,380.00, as opposed to nothing. The Debtor's estate will benefit, which is, as we indicate above, the touchstone of the Countryman definition. Finally, the public interest will benefit because the Debtor will be instilled with an incentive to retain the Premises and rehabilitate it, as opposed to the Defendant's expression of a desire to neglect the Premises entirely in the wake of her departure from it.

We therefore cannot adhere to the second reason articulated for rejecting the Debtor's argument that the transaction can be conceptualized as a mortgage, i.e., that it meets the strict confines of the Countryman definition of an executory contract. Requiring the contract here to be characterized as executory would not benefit the Debtor's estate.

c. THE POLICY OF § 365(i) SUPPORTS PARTIES IN POSSESSION OF REALTY, WHICH IS CONSISTENT WITH THE GOAL OF ALLOWING THE DEBTOR TO OPT NOT TO TREAT THE AGREEMENT AS AN EXECUTORY CONTRACT.

The third reason articulated in at least some of the cases holding that real estate installment sales contracts must be viewed as executory is that the presence of §§ 365(i) and (j), which are said to evince a Congressional intent to treat installment land contracts as executory contracts. However, although both of these Code sections do refer to contracts to purchase real estate as "executory contracts," it must be recalled that § 365(i) gives the party in possession the right to either terminate the contract or remain in possession of the realty. The party in possession is, moreover, given the flexibility of "assuming" the contract, yet offsetting payments by damages occurring thereafter, § 365(i)(2)(A), and thus is allowed to alter the normal confines of § 365, which require

the debtor to either unconditionally accept or reject an executory contract. As our discussion of *McCannon* suggests, different considerations come into play when the debtor is the vendor in such a contract, not in possession of the realty, as opposed to the situation here, where the Debtor is a vendee in possession of the realty. Thus, in *In re Mitchell*, 80 B.R. 350 (Bankr.W.D. Pa.1987), the court had no difficulty in treating a contract where the debtor was a vendor as an executory contract. *But see Pribonic, supra* (another judge of the same court determines that where the debtor was a vendor in such a contract, it is nevertheless not executory).

Without attempting to resolve the conflict between these two cases, we would simply observe, as did Judge Mabey in *Booth,* 19 B.R. at 56–57, that far different considerations are present when the debtor is a vendor not in possession of the realty than when the debtor is vendee. Not the least of the relevant considerations is that § 365(i) is directed at preserving the rights of parties in possession of realty, particularly residents, which we believe is a fundamental concern in interpretation of § 365. *See McCannon, supra,* 679 F.2d at 17–18. Therefore, the presence of § 365(i) does little to advance the argument against the position of the Debtor here.

d. THE FACT THAT THE BANKRUPTCY CODE ALLOWS THE DEBTOR TO ENHANCE HER LEGAL POSITION DOES NOT REQUIRE REJECTION OF HER ARGUMENT.

The final reason given in any of the cases for declining to follow *Booth* is the resistance to allowing a metamorphosis of an installment land sale contract to something more than it previously was, i.e., a mortgage-like arrangement, as is articulated in *Anderson, supra,* as quoted at page 296 *supra.* This reasoning is more of a visceral reaction than legal reasoning. Our previous discussion indicates that Pennsylvania law authorizes such a metamorphosis in certain circumstances, so it is not so surprising that it should take place here. It is somewhat disturbing to

us to see the Debtor effectively re-write a bad bargain which she willingly made. However, our previous discussions indicate that this benefit to the Debtor is not at a cost to the Defendant, but will actually benefit the Defendant more than any readily identifiable alternative resolution to the present conflict.

### 4. CONCLUSION: THE DEBTOR MAY OPT TO TREAT THE REAL ESTATE INSTALLMENT CONTRACT AS A SECURITY DEVICE INSTEAD OF AN EXECUTORY CONTRACT.

We therefore conclude that the Debtor is empowered to avoid the choice of unconditionally accepting or rejecting this Agreement, as she would be required to do were the Agreement deemed to be an executory contract, and conclude that she may exercise an option to treat the Agreement like a secured transaction. We do believe that it is important that a debtor affirmatively exercise this option, as soon as possible and prior to Confirmation or expiration of the period in which an executory contract must be accepted or rejected. In default of the debtor's making such a clear, unequivocal choice in timely fashion, we would be inclined to treat such a contract as an executory contract, especially given its hybrid nature. Here, as we previously indicated, the Debtor has clearly exercised her option to treat the Agreement in issue as a security device from the outset of her case, and we shall allow her to do so.

### 5. THE DEBTOR MAY UTILIZE § 506(a) TO VALUE THE EXTENT OF THE DEFENDANT'S SECURITY INTEREST IN THE PREMISES.

Once this decision that the Debtor may treat the Agreement as a security device rather than as an executory contract is reached, the clarity of the record and the pertinent legal principles render the result inevitable. The Debtor is then clearly entitled to bifurcate the Defendant's claim into a secured claim equal to the value of the Debtor's interest in the Premises and an unsecured claim for the balance pursuant to 11 U.S.C. § 506(a). *See In re Caster,* 77 B.R. 8, 13–14 (Bankr.E.D.Pa.1987); *In re*

*Blakey,* 76 B.R. 465, 468, 473, *modified on other grounds,* 78 B.R. 435 (Bankr.E.D.Pa. 1987); *In re Mitchell,* 75 B.R. 593, 597 (Bankr.E.D.Pa.1987) (hereinafter *"Mitchell I"*); *In re Jablonski,* 70 B.R. 381, 385–86 (Bankr.E.D.Pa.1987); and *In re Crompton,* 68 B.R. 831, 834–35 (Bankr.E.D.Pa.1987) (hereinafter *"Crompton I"*). *Cf. Scanlon, supra,* 80 B.R. at 132 (Debtor would be able to utilize §§ 502 and 506 in this fashion if court were not to deem the contract executory).

In order to apply § 506(a) in this manner, we must first ascertain the value of the premises as of the date of confirmation. *Blakey, supra,* 76 B.R. at 468–79; and *Crompton I, supra,* 68 B.R. at 835. A Confirmation hearing is presently scheduled on March 17, 1988. Although the Defendant apparently declined to stipulate that the value of the Premises is presently $7,000.00, she offered not even a scrap of evidence to rebut the appraisal of the Premises by Israel Silver offered by the Debtor concluding that the value of the Premises was $7,000.00 in April, 1987. Although we are reluctant to accept an appraisal as conclusive evidence of value in the absence of live testimony from the appraiser, *see In re Cole, Cole v. Sovran Mortgage Corp.,* 81 B.R. 326, 328–29 (Bankr.E.D.Pa.1988); and *In re Chandler,* 77 B.R. 513, 517 (Bankr.E.D.Pa.1987), we are compelled to accept such evidence as conclusive when the record contains no other evidence on this score.

Next, assuming that the Debtor, by becoming effective owner of the Premises, will assume the responsibility to pay same, we are obliged to deduct from the market value of the Premises the amount of prior unavoidable tax and water and sewer liens. *See Mitchell I, supra,* 75 B.R. at 597; and *Jablonski, supra,* at 390. The record made as to these figures was the Debtor's dispatch of Requests for Admission to the Defendant, asking her to admit the amounts of the tax liens at $1,545.90 and the water and sewer liens at $433.47. The Defendant's counsel claimed to have filed a written answer to these Requests for Admission stating that he did not admit their

accuracy, but had no reason to contest same. We have never located any copy of this Answer in either the main case or adversary file, nor have we been able to find a reference to it on either docket, and the Defendant's counsel was unable to produce a copy of same at the trial when the Debtor's counsel questioned its existence. Assuming *arguendo* that the Defendant did file an Answer, and that the Answer read as represented at trial, we would nevertheless deem these responses to constitute admissions of the contents of the requests, as they fail to clearly and specifically deny same. *See* 4A J. MOORE, FEDERAL PRACTICE, ¶ 36.05[4], at 36–57 to 36–58 (2d ed. 1987). *See also Goodman v. Neff*, 251 F.Supp. 565 (E.D.Pa.1966); and *In re Sweeten*, 56 B.R. 675, 677–78 (Bankr. E.D.Pa.1986). Such admissions become perforce part of the record. *Blakey, supra*, 76 B.R. at 469–71. Therefore, the figures set forth in the Request are deemed established in the record, and the Defendant's secured claim may accordingly be reduced to $5,020.63.

6. **IN LIGHT OF THE FOREGOING, THE DEFENDANT'S MOTION FOR RELIEF FROM THE AUTOMATIC STAY MUST BE DENIED.**

■ If the Debtor is able to propose payments to the Defendant via a reasonably-feasible Plan and make other commitments and payments sufficient to maintain the future taxes, water and sewer bills, and insurance against the property, the interest of the Defendant in the Premises will be adequately protected, thus requiring denial of the Defendant's § 362(d) motion. *See Mitchell I, supra*, 75 B.R. at 597–600; and *In re Crompton*, 73 B.R. 800, 809–12 (Bankr.E.D.Pa.1987) (hereinafter *"Crompton II"*).

Addressing the topic of Plan payments, we point out that the Debtor would be obliged to remit $5,020.63 to the Defendant, plus interest for the requested deferral in payment of this sum, pursuant to 11 U.S.C. § 1325(a)(5)(B)(ii). *Mitchell I, supra*, 75 B.R. at 598–99; and *Crompton II, supra*, 73 B.R. at 806–07. Applying the contract interest rate of ten (10%) percent,

which is probably either lower than or equal to the "market rate," *see In re Mitchell*, 77 B.R. 524, 529 (Bankr.E.D.Pa. 1987) (*"Mitchell II"*), will require a total of interest payments of approximately $1,380.00, or require total payments on account of the Defendant's claim of about $6,400.00. Adding the Trustee's ten (10%) percent commission will require total Plan payments of slightly over $7,000.00. The Debtor's Plan contemplates sixty (60) payments of $132.88, which will yield a total sum of $7,972.80. Although the Debtor's income is low, we are not prepared to find that she could not do so, and she apparently has made all Plan payments to date. These remittances are more than the total sum which the Debtor would have to pay on account of the Defendant's secured claim to render her Plan feasible, and therefore this Plan, if performed, would adequately protect the Defendant, so far as payments under the Agreement are concerned.

As our Opinions in *Mitchell I* and *Crompton II* establish, we believe that it is incumbent upon the Debtor to pay the costs of taxes and insurance on the Premises in order to adequately protect the Defendant. *See Mitchell I*, 75 B.R. at 599, 601; and *Crompton II*, 73 B.R. at 810–11. The Debtor here, apparently conversant with our rulings in these cases, offered to remit $300.00 annually towards taxes, $250.00 annually for insurance, and $30.00 monthly towards water and sewer bills in the future. As in *Mitchell I* and *Crompton II*, we shall condition denial of the stay motion on the Debtor's maintaining these payments, although current taxes appear lower than $300.00 annually.

We will also expressly condition our Order upon the Debtor's assumption of the delinquent tax and water and sewer obligations against the Premises. Such an assumption might not transpire otherwise, because these billings have all been made to the Defendant in her name. We consider this disposition just because the liabilities for those sums are being utilized to reduce the amount of the Defendant's secured claim.

On the final page of her initial "Memo," the Defendant suggests that she should be granted relief from the stay because the Debtor is contemptuously refusing to pay the $300.00 sum into escrow as directed by the pre-petition state court Order of July 15, 1987. There are several short answers to this argument. First, the Debtor's Plan contemplates payment of the Defendant's obligation in full, thus superseding the effect of not only the state court Order of July 15, 1987, but the entire state court action. Secondly, contrary to the opinion of the state lower court judge in *Whitaker v. Whitaker*, 43 D. & C. 430 (Warren Co. C.P. 1986), cited by the Defendant, we have held that the automatic stay *does* apply to state-court contempt proceedings. *In re Cherry*, 78 B.R. 65, 69–70 (Bankr.E.D.Pa. 1987). Thirdly, as we pointed out in our discussion at pages 298–99 *supra*, the disposition effected is not unfair to the Defendant, but rather allows her to make some recovery out of a bad situation partially of her own making. It will even have the beauty of saving her from further aggravation and costs of what promised to be extended state court litigation.

## F. CONCLUSION

An accompanying Order, granting relief to the Debtor in her Complaint and denying relief to the Defendant upon the Defendant's performance of the conditions enunciated herein will be entered.

### ORDER

AND NOW, this 3rd day of March, 1988, after a consolidated trial of January 28, 1988, on the Motion of Estelle Hill for Relief from the automatic stay and the above-captioned adversary proceeding, it is hereby ORDERED AND DECREED as follows:

1. Judgment is entered in favor of the Debtor, DETRA FOX, and against the Defendant, ESTELLE HILL, in the Adversary Complaint, as conditioned hereafter.

2. The extent of the value of the Defendant in the Debtor's interest in the Premises at 2357 Wilder Street, Philadelphia, Pennsylvania, is hereby determined to be $5,020.63.

3. The Defendant is determined to have a Secured Claim of $5,020.63 and an Unsecured Claim of $14,053.11 against the Debtor's estate.

4. The Defendant's Motion for Relief from the Automatic Stay is DENIED on the condition that the Debtor does the following:

   a. Assumes all real estate liens and water and sewer liens on the Premises.

   b. Obtains and pays for fire insurance on the Premises on or before May 1, 1988.

   c. Pays all future real estate taxes and water and sewer bills relative to the Premises as they come due.

   d. If the Debtor fails to comply with any of the terms of paragraphs 4(a), (b), or (c) herein, the Defendant shall provide notice of same to Debtor and her Counsel. If the default is not cured within twenty (20) days and no order granting any dispensation on motion for good cause shown is granted, the Defendant may certify same to the Court and obtain relief from the stay.

5. The hearing on Confirmation of the Debtor's Plan shall remain scheduled on

THURSDAY, MARCH 17, 1988, at 10:00 A.M. in Court Room No. 2 (Room 3718), United States Court House, 601 Market Street, Philadelphia, PA 19106.

6. No continuances of the hearing date set forth in paragraph five will be entertained.

7. This Order shall be filed and docketed in both the above-captioned main case and Adversary Proceeding.