**In re Edward Junior BREEDEN and Tina Marie Breeden a/k/a Tina Marie Ross.**

**Bankruptcy No. 92–31442.**

United States Bankruptcy Court, N.D. West Virginia.

April 11, 1995.

Kathy Santa Barbara, Martinsburg, WV, for Huntington Bank Martinsburg.

Joseph Caudle, Tampa, FL, for Edward and Tina Breeden.

Daniel Booth, Martinsburg, WV, for City Hospital.

### MEMORANDUM OPINION AND ORDER

L. EDWARD FRIEND, II, Bankruptcy Judge.

The matters presently before the Court include: (1) the Application for Payment of Arrearages filed by Huntington Bank Martinsburg, N.A.; (2) the Applications for Allowance and Payment of Attorney Fees and Expenses to Attorneys for Huntington Bank Martinsburg, N.A.; and (3) the Application for Allowance of Attorney Fees and Expenses filed by Counsel for the Debtors. Objections to Huntington Bank's various applications have been filed by the Debtors,

and City Hospital Inc. has formally objected to the application filed by Debtors' counsel.

## FACTUAL BACKGROUND

On December 11, 1987, Edward and Tina Breeden (hereinafter "Debtors") obtained a $30,000 loan from Huntington Bank Martinsburg, N.A. (hereinafter "the Bank"), which was known at the time as People's National Bank. As security for the loan, Debtors granted the Bank a first lien security interest against property located at 308 East Liberty Street and 304-½ Moler Avenue in Martinsburg, West Virginia. Debtors further indebted themselves to the Bank on July 21, 1988 in the amount of $21,000, which debt was secured by a first lien security interest against property located at 129 Woodberry Avenue, also in Martinsburg. Debtors also obtained a $42,800 loan from the Bank on October 28, 1988. This debt was secured by a first lien security interest in property located in Light's Addition, which is also located in Martinsburg. All of the security interests granted to the Bank were properly perfected by the filing of various Deeds of Trust with the Berkeley County Clerk's office.

Debtors subsequently fell behind in their payments on the aforementioned loans and ultimately filed for relief under Chapter 13 of the Bankruptcy Code on December 21, 1992 to stall the Bank's proposed foreclosure proceedings. At the time of the filing, Debtors were in arrears under the terms of the various notes in the approximate amount of $3,863.92, along with interest and late charges. At that time Debtors were also obligated to the Internal Revenue Service for at least $44,653.98 in priority tax claims.[1] On January 6, 1993 Debtors filed the first of their numerous plans with the Court. The Bank subsequently objected to this plan due to the fact that it failed to address the curing of Debtors' defaults under the notes. The Bank also filed a Motion for Relief from the Automatic Stay on March 5, 1993 in which it alleged that it's position was not being adequately protected and argued that cause existed for allowing it to proceed with foreclosure of the subject properties. By Order of June 23, 1993 (amended by Order of August 10, 1993) Debtors were required to bring their payments to the Bank up to date and, beginning with their July payments, to make future payments outside their plan directly to the Bank. By separate Order, Debtors were also required to file an amended plan with the Court.

Debtors ultimately fell further behind on their payments to the Bank and on October 12, 1993 the Bank filed a Motion to Convert Debtors' case to Chapter 7, along with a renewed Motion for Relief from the Automatic Stay. After a hearing was held on the Bank's motions on November 16, 1993, the Court issued a "drop-dead" Order in which it stated that if Debtors failed to make timely payments to the Bank under the notes secured by 129 Woodberry Avenue, 304½ Moler Avenue and 306 East Liberty Street the Bank would have the right, subject to ten days negative notice, to immediately foreclose on those properties. The Order further indicated that the automatic stay would remain in full effect as to the Light's Addition property, which was the Debtors' residence.

On March 18, 1994, after several extensions of time were granted by the Court to allow Debtors to obtain information necessary to fill out their delinquent tax returns, an amended plan was filed. The Bank subsequently filed an objection to the amended plan on March 22, 1994, in which it articulated that its central problem with the amended plan was that the plan still failed to cure the arrearages on the three notes held by the Bank. On March 25, 1994 the Court once again denied confirmation of Debtors' amended plan and gave them until May 2, 1994 to filed their second amended plan. Debtors filed said plan on May 4, 1994. After confirmation of Debtors' first amended plan was denied, the Bank filed another Motion to Convert their case to a Chapter 7. By Order of May 13, 1994 the Court denied the Bank's motion but also required Debtors to make monthly payments of $216 per

---

1. Debtors had not filed income tax returns for the years 1983 through 1988, FICA tax returns for taxable periods ending December 31, 1991, March 31, 1992, June 30, 1992, September 30, 1992 and December 31, 1992, and FUTA tax returns for 1991 and 1992.

month to the Bank for sixty months beginning June 1, 1994.

On June 15, 1994 the Court entered an Order which authorized Ms. Natalies Hoffman to list the subject properties for sale at prices agreed upon by Debtors, the Bank and Ms. Hoffman. As a result of this listing, Debtors received an offer of $69,900 for the property located at 129 Woodberry Avenue and on August 4, 1994 they made motion to sell the property and distribute the proceeds as follows: (1) approximately $21,000 to the Bank to pay off its first deed of trust on the property; (2) $5,194 in closing costs and realtor's fees; (3) $25,498.02 to the Internal Revenue Service for payment of its priority tax claim in full; (4) $11,185.21 to Debtors' counsel for payment of legal fees in full; and (5) the remaining sum of approximately $7,022.77 to the Bank for payment of the arrearages on the remaining notes at issue. Objections to the proposed distribution of sales proceeds were filed by the Bank, the United States Trustee, and City Hospital, Inc. These objections centered on the proposed payment of Debtor counsel's fees. Relevant to the issues presented for consideration here, the Bank objected to payment of Debtor counsel's legal fees prior to the curing of the arrearages on the notes held by it. The Court, by Order entered August 24, 1994, authorized the sale of the property free and clear of all encumbrances and further indicated that the balance of the sales proceeds, after payment of approximately $6,500 in closing costs and $21,368.43 to the Bank on its first deed of trust, was to be turned over to the Chapter 13 Trustee pending further direction from the Court.

On November 3, 1994 Debtors moved this Court for authority to sell their residence located in Light's Addition for $85,263.[2] Such authority was granted by Order of this Court on November 30, 1994. In its Order, the Court instructed that the sale proceeds, less closing costs, realtor's fees and the amount owing the Bank on its note, were to

be placed with the Chapter 13 Trustee pending further disposition by the Court.

After consummation of the Light's Addition sale, the Chapter 13 Trustee had on Debtors' account $80,974.87, of which he proposed to distribute $64,244.36 for payment in full of all Internal Revenue Service claims, all unsecured claims for which a proof of claim had been filed, and for his own fees.[3] The Bank objected to the Trustee's proposed distribution on the ground that it failed to make any provision for the payment of the arrearages due it under the one remaining note, which was secured by the 308 East Liberty Street and 304½ Moler Avenue properties. However, the Court, by Order of January 20, 1995, ordered the Trustee to undertake his proposed distribution and place the remaining $16,730.51 in escrow pending resolution of the issues addressed in this opinion.

## *ANALYSIS*

### *I. Arrearages*

■ As indicated above, the only remaining obligation of Debtors to the Bank is the note secured by the 304½ Moler Avenue and 308 East Liberty Street properties. The Bank has indicated that the amount needed to cure the default on this loan is $959.52. Debtors have objected to this figure, for the stated reason that they should not be required to pay interest on attorney fees incurred by the Bank's counsel, which they feel have been included in the Bank's arrearage calculations.

The Bank has submitted materials which indicate that after this Court's May 13, 1994 order the parties created an "arrearage loan" which consolidated the $5,109.90 in outstanding arrearage balances on the three notes owed it by Debtors at an agreed interest rate of 10.75% per annum. The Bank, however, also erroneously included $4,900.89 in the principal amount of that loan, which represented it's attorney fees incurred during the pendency of Debtors' case. The balance re-

---

**2.** The purchase price originally was $87,900, but the purchaser had put down a 3% deposit.

**3.** A third amended plan had been filed on July 27, 1994, and a fourth amended plan was filed on October 14, 1994. These plans were essen-

tially mooted, however, by the subsequent sales of 129 Woodberry Avenue and the Light's Addition property, and confirmation of both plans was denied by Order of this Court on December 16, 1994.

maining under the arrearage loan as of January 18, 1995 was $5,860.41 [4], inclusive of the attorney fees. The Bank now suggests that if the $4,900.89 representing attorney fees were removed, the appropriate arrearage balance due it would be $959.52. However, as Debtors suggest, the mere removal of the attorney fees is not adequate. During the eight months in which the attorney fees were included in the arrearage loan, the Bank earned approximately $362.44 in interest on them, which should also not be included. Therefore, the Court finds that the appropriate amount of arrearages due the Bank under the remaining note is $597.08.

## II. Fee Applications [5]

The Bank's final Applications for Allowance of Attorney Fees and Expenses at issue here were filed on August 17, 1994 and January 3, 1995. In its applications, the Bank asserts that, as an oversecured creditor within the meaning of § 506(b) of the Bankruptcy Code, it is entitled to seek reimbursement of the reasonable costs associated with the protection of its interests in the immediate bankruptcy which total, in the aggregate, $8,957.50 in attorney fees and $376.62 in expenses generated by the Bank's counsel. Debtors' Applications for Allowance and Payment of Attorney Fees and Expenses were filed October 14, 1994 and January 16, 1995. In the aggregate, these applications seek payment of $17,270.21 in attorney fees generated by their counsel during the course of this proceeding.

In the context of the Bank's fee applications, Bankruptcy Code section 506(b) states:

To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any *reasonable* fees, costs, or charges provided for under the agreement under which such claim arose.

11 U.S.C. § 506(b) (1984) (emphasis added).

Similarly, with regard to Debtors counsel's fee applications, Bankruptcy Code section 330 provides, in pertinent part, that after notice to all interested parties and a hearing, a court may award to a debtor's attorney:

(1) *reasonable* compensation for actual, necessary services rendered by such ... attorney, ... based on the nature, the extent, and the value of such services, the time spent on such services, and the cost of comparable services other than in a case under this title; and

(2) reimbursement for actual, necessary expenses.

11 U.S.C. § 330(a) (1986) (emphasis added).

The determination as to what constitutes reasonable compensation for actual, necessary expenses for purposes of reimbursement under these various Code sections is within the sound discretion of the court. *In re AOV Industries, Inc.*, 43 B.R. 468 (D.D.C.1984). In making this determination, the bankruptcy court does not look to state law, but rather makes an independent evaluation. *Unsecured Creditor's Committee 82–00261–11A v. Walter E. Heller & Co. Southeast, Inc.*, 768 F.2d 580 (4th Cir.1985). The burden of proof that services were actual and necessary and that the compensation requested is reasonable always rests upon the applicant who seeks the payment of professional fees from a bankruptcy estate, regardless of whether an objection has been filed thereto. *In re Bernard Hill, Inc.*, 133 B.R. 61 (Bankr.D.Md.1991) (citing *In re Metro Transportation Co.*, 78 B.R. 416, 420 (Bankr. E.D.Pa.1987); *In re Pettibone Corp.*, 74 B.R. 293 (Bankr.N.D.Ill.1987)).

When considering applications for compensation by attorneys, the courts in this circuit are bound by the "lodestar" principles, as explained in *Barber v. Kimbrell's,*

---

**4.** This figure represents the payment of $1,130 on or about August 24, 1994 to the bank from proceeds of the sale of Debtors' Woodberry Avenue property; the payment of $1,985 from the proceeds of the sale of Debtors' Light's Addition property; and $1,728 in payments under the Court's May 13, 1994 Order.

**5.** An itemized breakdown of the fee applications discussed here is on file with the Court, and copies have been sent to each party in interest.

*Inc.*, 577 F.2d 216 (4th Cir.1978), cert. denied, 439 U.S. 934, 99 S.Ct. 329, 58 L.Ed.2d 330 (1978). Under those principles, a court involved in determining or fixing the reasonableness of fees must consider the following factors:

1. the time and labor expended;

2. the novelty and difficulty of the questions raised;

3. the skill required to properly perform the legal services rendered;

4. the preclusion of other employment by the attorney due to the acceptance of the case;

5. the customary fee charged for like work;

6. whether the fee is fixed or contingent;

7. the time limitations imposed by the client or the circumstances;

8. the amount in controversy and the results obtained;

9. the experience, reputation, and ability of the attorney;

10. the "undesirability" of the case;

11. the nature and length of the professional relationship between the attorney and the client; and

12. attorney fee awards in similar cases.

*Id.* at 226 n. 8 (citing *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–719 (5th Cir.1974)). The Fourth Circuit has also expressly indicated that these "lodestar" factors are applicable to the determination of all proper awards for counsel fees in bankruptcy cases. *Harman v. Levin*, 772 F.2d 1150, 1152, n. 4 (4th Cir.1985).

Further instruction as to the application of the "lodestar" principles was provided in *Anderson v. Morris*, 658 F.2d 246 (4th Cir. 1981). In that case, the Fourth Circuit held that courts reviewing fee applications should:

1. ascertain the nature and extent of the services supplied by the attorney from a statement showing the number of hours worked and an explanation of how these hours were spent;

2. determine the customary hourly rate of compensation;

3. multiply the number of hours reasonably expended by the customary hourly rate to determine the initial amount of the fee award;

4. finally, adjust the fee on the basis of the other *Barber* factors, briefly explaining how they affected the award.

*Id.* at 249 (citing *In re First Colonial Corp. of America*, 544 F.2d 1291, 1298–1300 (5th Cir.1977); *Copper Liquor, Inc. v. Adolph Coors Co.*, 624 F.2d 575, 581–84 (5th Cir. 1980)).

### A. Bank's Applications

■ In order to prevail under § 506(b), a party seeking reimbursement of attorney fees must establish: (1) that it has an allowed secured claim; (2) that it is oversecured; (3) that the documents underlying its claim provide for such fees and costs; and (4) that the claim for fees and costs are reasonable. *In re Salazar*, 82 B.R. 538, 540 (9th Cir. BAP 1987).

■ In this case, the Bank has established to the Court's satisfaction that it was, in fact, the holder of certain notes secured by valid deeds of trust on the 129 Woodberry Avenue and Light's Addition properties. Proofs of claim based upon said notes were filed by the Bank on January 12, 1993. According to the Bank's proof of claim, the amount due under the note secured by the deed of trust on the Woodberry Avenue property at the time of sale was $21,368.43, which was never objected to by Debtors. That property sold for $69,900 leaving the Bank in a substantially oversecured position. Similarly, with regard to the Light's Addition property, the amount due under the note secured by the deed of trust was $42,800. This amount was also not objected to. That property sold for $87,900, once again leaving the Bank in an enviable posture. From the foregoing, then, it is obvious that the Bank has satisfied the first two requirements listed above. The Bank did, in fact, hold two allowed secured claims against the estate[6]. Furthermore, both

---

6. Pursuant to 11 U.S.C. § 502(a) and F.R.Bankr.P. 3007, unless a written objection is filed to a claim or interest, proof of which has been filed with the Court, the claim will be deemed allowed.

properties yielded sums sufficient to establish the Bank's oversecured status.

■ As to the third requirement listed above, in paragraph seven of each deed of trust at issue the parties agreed that:

If Borrower fails to perform the covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy ...). then Lender may do and pay for whatever is necessary to protect the value of the Property and the Lender's rights in the Property. Lender's actions may include ... appearing in court [and] paying reasonable attorney's fees.

Therefore, the Bank has also established to the Court's satisfaction that reimbursement of attorney fees in the event of default by Debtors was contemplated by the parties at the time the deeds of trust were executed.

Since the Bank has adequately established the existence of the first three factors listed above, it is entitled to receive reimbursement for the reasonable attorney fees and expenses expended by its counsel in protecting its interests during Debtors' bankruptcy.

### (1) Nature and Extent of Services Provided

The Court's analysis necessarily begins with a review of the Bank's interim and final fee applications, which contain its counsel's time records, to discern whether the amount of time claimed to have been expended is reasonable in light of what Bank counsel claimed it did. In its applications, the Bank establishes that its counsel, Steptoe & Johnson, billed it for a total of 70.8 hours worth of work. In analyzing those 70.8 hours, the Court notes that some deficiencies in the time records submitted by Steptoe & Johnson make a complete reasonableness determination impossible.

■ Significantly, numerous entries involve the "lumping" of different tasks within one block of time. This practice has been generally frowned upon by bankruptcy courts for two reasons. One, it allows counsel to claim compensation for rather minor tasks which, if reported separately, would not be compensable. Two, it prevents the Court from determining whether individual tasks were expeditiously performed within a reasonable period of time because it is impossible to separate the services provided into individual segments. In re Copeland, 154 B.R. 693 (Bankr.W.D.Mich.1993); In re Leonard Jed Co., 103 B.R. 706 (Bankr.D.Md. 1989) (citing In re Seneca Oil Co., 65 B.R. 902 (Bankr.W.D.Okla.1986); In re Pettibone Corp., supra; In re Metro Transportation Co., supra; In re Woerner, 67 B.R. 685 (Bankr.E.D.Pa.1986); In re Bible Deliverance Evangelistic Church, 39 B.R. 768 (Bankr.E.D.Pa.1984)). In this instance, the Court has found approximately thirty-two different entries which involve the practice of "lumping," all of which will be disallowed.[7]

Based upon its review of Steptoe & Johnson's time records, and with the exclusion of the thirty two entries discussed above, the Court finds that the reasonable amount of time required to properly represent the Bank was 35.25 hours, apportioned among the Steptoe & Johnson personnel as follows: James D. Steptoe—7.4 hours; Kathy M. McCarty—27.85 hours.

■ The next step the Court must undertake in computing the lodestar is a decision regarding a reasonable rate to be charged for the services reasonably rendered by Steptoe & Johnson. This requirement is satisfied by compensating attorney's and other personnel at the "prevailing market rates in the relevant community." Blum v. Stenson, 465 U.S. 886, 895, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984). To this end, the law firm's actual billing rates provide a relevant "starting point" for establishing such a rate. See Gusman v. Unisys Corp., 986 F.2d 1146 (7th Cir.1993). In this instance, the customary fee charged by Bank's counsel for the services performed was $130 per hour. The

---

**7.** The Court stresses that the disallowance of the "lumped" entries is not intended to suggest that the services provided were not beneficial to the Bank. Those entries were removed from consideration solely because the format in which they were presented did not allow for a thorough reasonableness analysis.

Court does not have any reason to dispute the reasonableness of this rate, and will therefore conduct its analysis using that figure.

The initial fee, or "lodestar" in this case is $4,582.50, exclusive of expenses. This figure is computed by multiplying the reasonable number of hours performed by the reasonable fee, as determined above.

 The final step in determining the reasonable fee award figure in this case is for the Court to adjust the fee on the basis of the remaining "Johnson" factors if it deems such adjustment appropriate.

2. *Novelty and Difficulty of the Questions.* The case presented no novel or particularly complex legal issues for the Bank's counsel.

3. *Skill Requisite to Perform Services Properly.* The law firm of Steptoe and Johnson is a highly-esteemed law firm with an excellent bankruptcy department. It produces high quality work and its attorneys who appear before this Court are extremely capable and prepared.

4. *Preclusion of Other Employment.* Counsel was not precluded from other employment by taking on the representation of the Bank. Indeed, the file reflects that Bank's counsel also represented Martinsburg Lumber & Coal Company, Inc. in this bankruptcy.

6. *Whether the Fee is Fixed or Contingent.* As indicated from the time records submitted, Bank counsel's fee appears to be fixed at $130/hour.

7. *Time Limitations.* In light of the fact that this case has been before the Court for over two years, it does not appear that any pressing time constraints were placed upon Bank's counsel.

8. *Amount Involved and Results Obtained.* The Court is of the opinion that the total of $8,957.50 charged for the services rendered on the Bank's behalf does not appear exorbitant. The record in this case reflects that the actions taken by the Bank's counsel were necessary to, and generally effective in, protecting the Bank's position. In fact, after having been involved in this case

to a much more intimate degree than it would have preferred, the Court is aware that aside from performing work on behalf of its own client, the Bank's counsel went a significant way in aiding the Debtors' cause through repeated conferences with their counsel involving instruction and guidance on bankruptcy issues presented by the case, drafting notices and pleadings, and by generally directing the course of this proceeding to a much more favorable result for all concerned than might have been obtained otherwise.

9. *Experience, Reputation and Ability of the Attorneys.* As indicated above, the Bank's counsel maintains high levels of knowledge and ability.

10. *"Undesirability" of Case.* Representation of the Bank in this matter could not be considered undesirable to Steptoe & Johnson.

11. *Nature and Length of Relationship—* From all indications, the Bank enjoys an ongoing relationship with its counsel.

12. *Awards in Similar Cases.*—After some review, the Court finds that the claim of $8,957.50 for services rendered in this type of case comports with fees charged in similar cases and is neither exorbitant nor unreasonable.

Based upon the foregoing analysis, the Court finds that the lodestar fee for the Bank's fee application should be increased to the original $8,957.50 claimed. This increase is justified primarily in light of the significant amount of work performed by the Bank's counsel in the furtherance of this case in general.

**(2) Expenses**

 To the base fee award determined above, the Court will add reasonable expenses incurred on behalf of and claimed by the Bank for reimbursement. Reimbursement will be allowed for photocopying, filing fees, and the other expenses attributable to the Bank, but not for general postage, which is usually considered an "out of pocket" cost of doing business. *See In re Leonard Jed Co. ("Jed II")*, 118 B.R. 339, 342 (Bankr. D.Md.1990). Therefore, the Bank will be

812

allowed expense reimbursement totalling $350.03.

In sum, then, the Court finds that the Bank should be reimbursed, pursuant to 11 U.S.C. § 506(b), the total of $9,307.53 for reasonable attorney fees and expenses paid by the Bank to Steptoe and Johnson during this bankruptcy proceeding.

### B. Debtor Counsel's Applications

 In the context of section 330(a) it has become axiomatic that before a debtor's attorney will be awarded compensation out of the bankruptcy estate, he must establish: (1) that the services rendered were "actual and necessary;" (2) that the services were either economically beneficial to the estate or benefited the administration of the estate; and (3) that the fees charged are reasonable. *See generally, In re DN Associates,* 3 F.3d 512 (1st Cir.1993); *In re Lederman Enterprises, Inc.,* 997 F.2d 1321 (10th Cir.1993); *Grant v. George Schumann Tire & Battery Co.,* 908 F.2d 874 (11th Cir.1990); *In re Amstar Ambulance Service, Inc.,* 120 B.R. 391 (Bankr. N.D.W.Va.1990); *In re Heck's, Inc.,* 112 B.R. 775 (Bankr.S.D.W.Va.1990); *In re Robbins,* 151 B.R. 364 (Bankr.W.D.Va.1993); *In re Grimm,* 156 B.R. 958 (Bankr.E.D.Va.1993); *In re Lilliston,* 127 B.R. 119 (Bankr.D.Md. 1991); *In re Sounds Distributing Corp.,* 122 B.R. 952 (Bankr.W.D.Pa.1991); *In re J.F. Wagner's Sons Co.,* 135 B.R. 264 (Bankr. W.D.Ky.1991); *In re James Contracting Group, Inc.,* 120 B.R. 868 (Bankr.N.D.Ohio 1990). In order for services to be considered "necessary," the task performed by counsel must facilitate the successful representation of the debtor or the estate. *In re Rheam of Indiana, Inc.,* 133 B.R. 325 (Bankr.E.D.Pa. 1991).

 Once again, the Court's analysis of Debtor counsel's fee application begins with a review of the time records submitted in support of his claimed fee of $17,270.21 for 132.48 hours of service. Deficiencies in those time records, however, make it impossible for the Court to analyze the reasonableness of many of the entries claimed for reimbursement. First, several entries contain descriptions of services performed by Debtor's counsel which are entirely insufficient for the

Court to determine whether or not they should be compensable. For example, entries such as "Drafting" and "Draft ltrs to PNB and Breedens" do not begin to attempt to explain the purpose behind the actions taken or their relevance to the furtherance of Debtors' goals in the present bankruptcy.

Next, Debtors' counsel also has submitted several entries that "lump" different tasks into one block of time and, for the reasons set forth previously, these entries will not be allowed.

 Most disturbing to this Court is the abundance of entries in the time records which reflect a total lack of what has come to be known as "billing judgment." As explained by the United States Supreme Court, attorneys applying to a court for statutory attorney fees

> should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary; just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission. 'In the private sector, "billing judgment" is an important component in fee setting. It is no less important here.'

*Hensley v. Eckerhart,* 461 U.S. 424, 434, 103 S.Ct. 1933, 1940, 76 L.Ed.2d 40 (1983) (quoting *Copeland v. Marshall,* 641 F.2d 880, 891 (1980)). Although the *Hensley* case dealt with a non-bankruptcy fee application, the Court recognizes the soundness of the proposition asserted therein and, in the total absence of any evidence of billing discretion in this case, will exercise its own judgment and write off those charges which it deems excessive, redundant, unjustifiable or otherwise unnecessary. *See, In re Leonard Jed Co.,* 103 B.R. at 714; *In re New England Caterers, Inc.,* 115 B.R. 724 (Bankr.D.Mass.1989).

 Several particularly egregious entries deserve exposure to illustrate the types of charges the Court intends to write off. First, Debtors' counsel charged his clients $170 for 68 minutes of work on August 11, 1993 to "Draft new Motion for Continuance." After reviewing the file, the Court found the referenced motion to contain four sparse paragraphs which simply indicated the rea-

sons for the requested continuance. Also, on September 24 and 25, 1993, Debtors were charged $225 for 90 minutes of drafting on another minuscule Motion for Continuance and a two-paragraph proposed order granting the continuance. But by far the most outrageously excessive charge can be found in entries for July 23, 1994. On that date Debtors' counsel charged $1,092.50 for 7.3 hours spent drafting the Motion to Sell the 129 Woodberry Avenue property and getting it signed by Debtors. The motion, two pages in length, simply outlines the offer received and suggests a proposed distribution of the sale proceeds. After reviewing the motion, the Court cannot imagine the quandary that Debtors' counsel could have faced which could even remotely justify the expenditure of over seven hours of his time. Unfortunately, the above referenced entries are not the only examples of superfluous charges presented in the time records submitted by Debtors' counsel. In the interest of judicial economy, however, the Court will not belabor the issue by addressing each and every entry which it intends to write off.

 In a similar vein, six entries listed involve services of a non-legal nature being rendered by Debtors' counsel. For example, entries such as "Review/place case dates on computer system" and "Prep all mailings/final" suggest that counsel performed and charged for non-legal functions at legal hourly fee rates. However, the work for which lawyers receive compensation must be legal, not ministerial or clerical. *In re Copeland*, 154 B.R. at 699 (citing *In re Taylor*, 66 B.R. 390 (Bankr.W.D.Pa.1986); *In re Vlachos*, 61 B.R. 473 (Bankr.S.D.Ohio 1986)). Therefore, the time spent by Debtors' counsel on such non-legal functions will be compensated only at clerical staff rates.

 Finally, some entries in the time records reflect charges for general research or review of cases. These entries will also not be allowed by the Court. For example, on January 11, 1994, Debtors' counsel charged $600 for 4 hours of research into "lien releases." This research does not appear from the records to have aided Debtors' counsel in effectively representing his clients interests. A motion to avoid liens was filed on behalf of Debtors, but was subsequently withdrawn. Aside from that motion, no other direct use of the information obtained in the research can be borne out of the time records. In not allowing these research entries the Court does not attempt to suggest that research, by itself, can never be reimbursable, but only finds that it will not be so unless it is related to the direct accomplishment of a specific and immediate task.

 The Court's review of Debtor counsel's time records leads to the conclusion that the majority of time and labor claimed was not necessary for the effective representation of Debtors in this case. Based upon this review, the Court has determined that the total number of hours reasonably required to properly represent Debtors is 52.72, which is apportioned among Debtor counsel's personnel as follows: Joseph Caudle—38.82; secretary—13.9.

 The Court must next determine an appropriate rate to be charged for the services rendered. As stated earlier, a reasonable rate to be used would be the prevailing market rate within the community. Therefore, the Court shall use the rate of $130 per hour to compensate Debtors' counsel and $10 per hour to compensate for his secretary. The Court is of the opinion that Debtor counsel's rate should not be higher than the Bank counsel's rates in light of the relative inexperience demonstrated by Debtors' counsel with regard to bankruptcy-related issues. Therefore the basic "lodestar" fee in this case is $5,185.60.

 The final step which the Court must undertake here is to determine the appropriate adjustment, if any, to be made to the base fee. However, it is this Court's opinion that the base fee derived in this case is more than adequate to reimburse Debtors' counsel for the reasonable fees incurred during the pendency of this case. The Court initially would note that this case was a fairly general consumer Chapter 13 bankruptcy. Two issues, the tax and arrearage problems, were the major hurdles to overcome, neither of which would have presented much of a problem to an experienced bankruptcy attorney. The Court also notes that the fee customarily

charged by attorneys regularly practicing before it for a case such as this ranges from $800 to $1,500. In this context, the Court feels that this case could have been administered in a more expeditious and effective manner, and at a significantly decreased cost to the estate, by a more experienced attorney.

The Court also feels that no downward adjustment to the base fee is warranted either. Debtors' counsel did, in fact, significantly reduce Debtors' tax liability, which conferred a direct economic benefit upon the bankruptcy estate to the tune of approximately $19,156. The Court also recognizes that, to some extent, Debtors' counsel was responsible in creating the situation here, in which all of Debtors' creditors were paid in full.

In light of the foregoing analysis, the Court hereby finds that Debtors' counsel should be reimbursed, pursuant to 11 U.S.C. § 330(a), a total of $5,185.60, which represents reasonable compensation for the actual, necessary services rendered on behalf of the Debtors by their counsel in this case.

In summation, the Court hereby finds that out of the remaining monies held by the Chapter 13 Trustee, the total of $597.08 should be paid to Huntington Bank Martinsburg, N.A. to pay the arrearages on the remaining note owed the Bank by Debtors. It is so **ORDERED.**

It is **FURTHER ORDERED** that Huntington Bank Martinsburg, N.A. shall also receive from the Chapter 13 Trustee $9,307.53 for reimbursement under its fee applications; and

It is **FURTHER ORDERED** that Joseph Caudle, Esq. shall also receive $5,185.60 for reimbursement of his reasonable fees incurred in this bankruptcy proceeding; and

It is **FURTHER ORDERED,** that any remaining funds held by the Trustee upon payment of the above expenses shall enure to the benefit of, and shall be distributed to, the Debtors.