**In re Mario PELLEGRINO, Frances Pellegrino, Debtors.**

**Bankruptcy No. 96–16103DAS.**

United States Bankruptcy Court, E.D. Pennsylvania.

Feb. 27, 1997.

John J. Koresko, V, Norristown, PA, for Debtors.

John D. Shea (David L. Tillem, Melissa A. Hager, on the brief), Wilson, Elsor, Moskowitz, Edelman & Dicker, Philadelphia, PA, for Subaru American Credit.

Edward Sparkman, Standing Chapter 13 Trustee, Philadelphia, PA.

## OPINION

DAVID A. SCHOLL, Chief Judge.

### A. INTRODUCTION

The Second Amended Chapter 13 Plan ("the Plan") filed by MARIO PELLEGRINO and FRANCES PELLEGRINO ("the Debtors") attempts to pay off the Debtors' Net (Closed End) Lease Purchase Option of August 24, 1994 ("the Lease"), of a 1995 Subaru Legacy station wagon ("the Car"), by paying the assignee of the Lease, Subaru American Credit ("Subaru"), the amount necessary to cure the payment delinquencies and the "Lease Residual Value" pay off due at the end of 48 months, in about the 30th month of the Lease, over the 60–month Plan period. We find that the Plan is based on a series of misconceptions by the Debtors, causing them to argue that the Lease is in fact an installment sale contract under the allegedly-applicable Pennsylvania Motor Vehicle Sales Finance Act, 69 P.S. § 601, *et seq.* ("the MVSFA"), but declining to give Subaru that to which it would be entitled even if the Lease contract were treated as a sale. Among the reasons why the Plan cannot be confirmed is our conclusion that the Lease is not covered by the MVSFA and that the prior decisions in this jurisdiction and elsewhere that hold such contracts to be "true" leases are correct.

### B. PROCEDURAL AND FACTUAL HISTORY

The Debtors filed a joint Chapter 13 bankruptcy case on July 1, 1996. The only unusual aspect of the case to date is that, despite a paucity of docket entries, no adversary filings, and the instant dispute with Subaru as

the only matter which has commanded our attention, the Debtor's counsel has filed a fee application requesting compensation of $6,582.50 for services performed through January 7, 1997. We have not ruled on this application and will undoubtedly be obliged to carefully consider the benefit of all of the services allegedly performed to the Debtors' estate and the Debtors themselves before we do so. *See* 11 U.S.C. §§ 330(a)(4)(A), (a)(4)(B).

In addition to the terms generally described at page one *supra,* the Lease obligated the Debtors to pay monthly rental payments of $335.26 for 48 months, a total of $16,092.48, beginning in September 1994, and further provided them with an option to purchase the Car by paying a "residual value" of $10,471.34 at the end of the 48-month payment period. The debtors' original plan proposed a cure of an alleged rental delinquency of $922.74 over the 60 months of the Plan, plus 60 installment payments towards the $10,471.34 "residual value," without additional interest added, as payment in full for the Car.

Subaru filed an Objection to confirmation of this Plan on August 28, 1996, claiming that the rental delinquency was in fact $1,256.74, but, more significantly, that the Debtors were not proposing to assume the Lease under its own terms. The Debtors responded by filing a first amended plan on November 18, 1996, and thereafter the instant Plan on January 7, 1997. The only change in the terms of the Plan from the terms of the original plan regarding the Debtors' treatment of Subaru was an agreement to cure the delinquency of $1,256.74 alleged by Subaru. While perhaps unwisely not re-filing objections to the Plan, Subaru's counsel appeared to argue against confirmation on the basis of its original objections at the first continued confirmation hearing on the Plan on February 13, 1997. At the request of the Debtors, they and Subaru were accorded until February 21, 1997, to simultaneously file briefs on the related issues of the validity of Subaru's objections to, and confirmability generally of, the Plan.

## C. DISCUSSION

The Debtors' counsel, at the confirmation hearing, acknowledged the presence of *In re Murray,* 191 B.R. 309 (Bankr.E.D.Pa.), *aff'd,* 201 B.R. 381 (E.D.Pa.1996), holding that an almost identical contract form was in fact a true lease. However, he boldly asserted that counsel in *Murray* and both courts ruling in that case had overlooked the application of the MVSFA to such a contract.

Our review of the pertinent caselaw reveals authority in numerous other jurisdictions holding that very similar contracts are "true leases" under the laws of other jurisdictions, typically Article 9 of the Uniform Commercial Code, which is considered in *Murray.* *See, e.g., In re Winston,* 181 B.R. 589 (Bankr.N.D.Ala.1995); *In re Zaleha,* 159 B.R. 581 (Bankr.D.Idaho 1993); *In re Lerch,* 147 B.R. 455 (Bankr.C.D.Ill.1992); *In re Wallace,* 122 B.R. 222 (Bankr.D.N.J.1990); *In re Haigler,* 119 B.R. 531 (Bankr.D.S.C. 1989); and *In re Farrell,* 79 B.R. 300 (Bankr. S.D.Ohio 1987). The only dissenting decisions which we could locate, *In re Thompson,* 101 B.R. 658 (Bankr.N.D.Okla.1989), *rev'd sub nom. In re Cole,* 114 B.R. 278 (N.D.Okla. 1990); and *In re Harvey,* 80 B.R. 533 (Bankr.N.D.Okla.1987), were, as noted, reversed and effectively overruled, respectively, in *Cole, supra.*

The only MVSFA provision referenced by the Debtors' counsel, which he apparently believes is sufficient to carry the day for the Debtors, is 69 P.S. § 603(10), the broad definition of "installment sale contract" appearing in the MVSFA, which reads as follows:

10. **"Installment sale contract"** or **"contract"** shall mean any contract for the retail sale of a motor vehicle, or which has a similar purpose or effect under which part or all of the price is payable in two or more scheduled payments subsequent to the making of such contract, or as to which the obligor undertakes to make two or more scheduled payments or deposits that can be used to pay part or all of the purchase price, whether or not the seller has retained a security interest in such motor vehicle or has taken collateral security for the buyer's obligation, and shall include any loan, any mortgage, any condi-

tional sale contract, any purchase-money chattel mortgage, any hire-purchase agreement *or any contract for* the bailment or *leasing of a motor vehicle* under which the hire-purchaser, the bailee *or lessee contacts to pay as compensation a sum substantially equivalent to or in excess of the value of the motor vehicle* and any other form of contract which has a similar purpose or effect: . . (emphasis added).

■ We are unable to agree with the Debtors. A contract which is "a mere lease arrangement" is not within the scope of the MVSFA. *Genesis Leasing Co. v. Minchoff,* 315 Pa.Super. 437, 443, 462 A.2d 274, 277 (1983). *See also M.M. Waterbor, Inc. v. Livingood,* 179 Pa.Super. 610, 614–16, 117 A.2d 790, 792 (1955). The stated purpose of the MVSFA is to prevent the use of "bailment leases" and other devices masking "true sale" transactions from regulation. *See* 69 P.S. § 602; *Anderson v. Automobile Fund,* 258 Pa.Super. 1, 9–10, 391 A.2d 642, 646 (1978) (opinion in support of affirmance and remand); and *Waterbor, supra,* 179 Pa.Super. at 614–15, 117 A.2d at 792. There is no evidence that the use of the Lease form in issue constitutes an unscrupulous, improper device, like the "dragging the body" practices at issue in *Anderson. See id.,* 258 Pa.Super. at 15–23, 391 A.2d at 649–53 (Opinion of Spaeth, J., in support of reversal). *Compare Smith v. Gold,* 4 D. & C.2d 745 (Philadelphia, Co. C.P.1957); and *Daley Mack Sales, Inc. v. Klink,* 26 D. & C.3d 341 (Somerset Co. C.P.1982) ("lease" contracts held subject to MVSFA where it was proven that the parties contracting for the vehicles in issue intended to purchase rather than lease the vehicles). *Cf. In re Brown,* 134 B.R. 134, 139–43 (Bankr.E.D.Pa.1991) (this court follows Judge Spaeth's decision in declaring "dragging the body" impermissible in a home improvement financing transaction).

■ We can readily distinguish the instant Lease from devices where we sustained efforts of debtors to treat lease-like contracts as sales, notably in the areas of installment real estate contracts, *see In re Rowe,* 110 B.R. 712, 722–23 (Bankr.E.D.Pa.1990); and *In re Fox,* 83 B.R. 290, 299–302 (Bankr. E.D.Pa.1988), and rent-to-own appliance and furniture contracts. *See In re Stewart,* 93 B.R. 878, 885 n. 3 (Bankr.E.D.Pa.1988). Real estate installment contracts are treated like mortgages in many significant respects under Pennsylvania law. *See Fox, supra,* 83 B.R. at 296–98. Rent-to-own transactions are usually characterized by gross overcharging of customers. *See, e.g., Fogie v. THORN Americas, Inc.,* 95 F.3d 645, 651–52 (8th Cir.1996); and *Stewart, supra,* 93 B.R. at 885 n. 3. There is no evidence that the instant Lease contract was treated like a sale in any respect by any of the parties. No gross overcharging of the Debtors in the Lease transaction has been proven.

■ Not only do the Debtors argue that the instant Lease should be treated like a sale, but also they attempt to extend their position beyond that of the debtors in, *e.g., Murray, supra,* 191 B.R. at 311 & n. 1; *Winston, supra,* 181 B.R. at 591; *Wallace, supra,* 122 B.R. at 224; and *Farrell, supra,* 79 B.R. at 301. In those cases, the debtors attempted to obtain title to vehicles by paying off the present fair market value of the vehicles, either by not utilizing the "residual value" or its equivalent as a reference point in determining the payment to be made at all, *e.g., Murray, supra,* 191 B.R. at 311, 312; and *Wallace, supra,* 122 B.R. at 224, 225, or utilizing it as a reference point only in determining value after all payments due under the lease portion of the contracts in issue had been made. *E.g., Winston, supra,* 181 B.R. at 591. Here, however, *the Debtors propose to pay off the Lease balance about a year and a half before the Lease term expires and therefore before about 18 months' payments due under the Lease have been remitted!* In that way, the Debtors propose to avoid making a significant portion of the payments necessary to entitle them to exercise a purchase option under the terms of the Lease.

No justification for this shortchanged treatment of Subaru is proffered by the Debtors. If the Lease were found to be a sales contract, the Debtors could assert no more than their rights as title holders of property subject to security interest, *i.e.,* they could "cram down" the secured claim of the secured creditor to the value of its "collateral," but would also be obliged to pay

deferral rate interest on the value of the collateral over the life of the plan. *See Farrell, supra,* 79 B.R. at 301. *See generally General Motors Acceptance Corp. v. Jones,* 999 F.2d 63 (3d Cir.1993) ("cramdown" interest rate on motor vehicle should be the rate that the lender would charge a comparable new customer); *Sapos v. Provident Institution of Savings in Town of Boston,* 967 F.2d 918, 916–28 (3d Cir.1992) (plan which "crams down" a secured claim must pay off the secured claim in its entirety plus interest); and *In re Cole,* 122 B.R. 943, 948–52 (Bankr. E.D.Pa.1991), *aff'd,* C.A. No. 91–1578 (E.D.Pa. May 22, 1991) (debtor exercising "cramdown" cannot thereby alter the terms of payment of the debtor's mortgage). In no event would the Debtors be entitled, at this point, prior to making the 48 monthly payments, to pay off the "residual value" of the Car provided in the Lease as of the date that the 48 months of payments had been made and the Car was 48 months old. It has not been proven that the "residual value" is the same as the fair market value as of any date, but it is certainly not logical to claim that it should be so considered before the 48–month period has expired. More significantly, the Debtor cannot choose to utilize, for certain purposes, a certain aspect of a Lease, such as use of the "residual value," for purposes for which it was never intended.

The Debtors blithely ignore the foregoing concepts in their treatment of Subaru under the Plan and loosely invoke several bankruptcy principles out of their context in an effort to defend the Plan. First, they contend that Subaru's objections should be dismissed because Subaru failed to meet its necessary evidentiary burden at the confirmation hearing, citing *In re Fries,* 68 B.R. 676, 682–86 (Bankr.E.D.Pa.1986). This court has expressed its interpretation of *Fries* and the burdens of proofs of objectors to Chapter 13 plans and Chapter 13 debtors in support of their claims in *In re Fricker,* 116 B.R. 431, 436–38 (Bankr.E.D.Pa.1990), and, for the most part, recently reiterated same in *In re*

*Rothman,* 204 B.R. 143, 156 (Bankr.E.D.Pa. 1996).

In *Fricker,* we cited *Fries* for the principle that, while an objector generally has the burden of producing evidence in support of an objection,[1] this burden can be met without presenting actual testimony in support of the objection. 116 B.R. at 437. We further stated that, unless the objection appeared frivolous or unfounded, the debtor, as the party with the burden of proof and with the most access to proof on most issues relevant thereto, bears the burden of presenting evidence to sustain confirmation. We also noted in *Fricker* that this court retains an independent duty to determine whether a plan is confirmable, even in the absence of any objections from creditors or the trustee. 116 B.R. at 437. *See also In re Gurst,* 76 B.R. 985, 989 (Bankr.E.D.Pa.1987).

In the instant factual setting, Subaru filed written objections to confirmation. Good practice would have required Subaru to refile its objections to later versions of the Plan, although it should have been clear to the Debtors that the Plan did not cure all of Subaru's objections to the original plan. Subaru appeared at the hearing and its counsel reiterated that most of the objections remained unaddressed in the Plan. These actions on Subaru's part were clearly sufficient to meet its burden of asserting a non-frivolous and well-founded objections to the Plan. The Debtors' treatment of Subaru was in fact so seriously contrary to that permitted by the Code that we would have been justified in raising some of these objections *sua sponte.*

Therefore, the issue actually before us for decision was whether the Debtors presented sufficient evidence to permit us to confirm the Plan in light of Subaru's objection and our own observations that the treatment of Subaru appeared illegal and improper. The Debtors failed to overcome our skepticism.

The Debtors also presented several other arguments, all of which we find mis-

---

1. The *Rothman* statement that "the creditor has the initial burden of *proving* " (emphasis added) the nature of an objection, 204 B.R. at 156, is therefore slightly inaccurate, and must be read in the context of our further enunciations regarding the burden of proof on confirmation issues in *Fricker.*

placed and poorly developed. First, they argue, contrary to the result in *In re Karfakis,* 162 B.R. 719 (Bankr.E.D.Pa.1993) (franchise and lease held to be one indivisible contract), a decision of Judge Raslavich erroneously attributed to this court, that the Lease may be divided into a pure lease portion and an executory option contract portion. A faint echo of this argument appears in *In re Steffen,* 181 B.R. 981 (Bankr. W.D.Wash.1995), a case not cited by the Debtors, but wherein a "SmartBuy" contract designated as a sale contract, but calling for a final balloon payment, was held to be an executory contract only as to the final "option" to pay the balloon. However, the Lease contract in issue is distinguishable from that in *Steffen,* as it is clearly designated as a lease. To separate the Debtors' Lease obligation to initially pay rentals for 48 months before exercising the purchase option from the Lease option itself would constitute a bestowal of an unmerited windfall to the Debtors.

■ The Debtors attempt to justify their re-writing of the parties' Lease as a mere modification of its terms. The cure of a delinquency in an executory lease contract is a permissible "modification" of such a contract, but the cure must be effected promptly. *Cf. In re Whitsell,* 163 B.R. 752, 755–56 (Bankr.E.D.Pa.1994) (24–month cure permitted, extending 11 U.S.C. § 365(b)(1)(A) to its farthest boundaries). However, to in effect simply reduce the amount of the Debtors' requisite contractual payment obligations to Subaru by the medium of a Chapter 13 plan, with no apparent justification in the Code or elsewhere for doing so, is unprincipled and impermissible. If the entire Lease, including payment terms and an option to purchase which we find are inseparable, is not fully assumed, Subaru can proceed to obtain relief from the automatic stay to recover the Car. *See, e.g., In re Reice,* 88 B.R. 676, 682, 684 (Bankr.E.D.Pa.1988); and *In re Grant Broadcasting of Philadelphia, Inc.,* 71 B.R. 891, 901 (Bankr.E.D.Pa.1987).

■ The Debtors' final argument—which we understand as a contention that this court should let them have the Car on terms which they have dictated in the Plan because they need the Car more than Subaru does—articulates a collectivist notion which is unsupported in the Code. The Debtors must exercise their rights against Subaru within the parameters of the parties' Lease except where the Code expressly provides them with rights to cure delinquencies and exercise "cramdown" rights.

In no sense can this court consider confirming a plan which so clearly violates Subaru's rights. As a footnote, we note that it is most doubtful that any portion of the services represented by assertion of these rather apparently futile arguments will be permitted to enhance the fee application of the Debtors' counsel. *See* 11 U.S.C. §§ 330(a)(4)(A), (a)(4)(B).