**In re Scott ROTHMAN a/k/a Scott Rothman, Dr., Debtor.**

**Bankruptcy No. 96–12167DAS.**

United States Bankruptcy Court, E.D. Pennsylvania.

March 10, 1997.

that the funds were not received for the beneficial interest of Goldberg. Thus, it meets the classic definition of when a resulting trust arises. Restatement (Second) of Trusts § 404 (1959).

John J. Koresko, V, Norristown, PA, for Debtor.

Richard H. Anderson, Media, PA, for Andrew L. Mozino, Executor of the Estate of Joseph S. Mozino.

Edward Sparkman, Phila., PA, Standing Chapter 13 Trustee.

## OPINION

DAVID A. SCHOLL, Chief Judge.

### A. INTRODUCTION

Presently, we have several inter-related matters before us in the contentious individual Chapter 13 bankruptcy case of SCOTT ROTHMAN, a/k/a Dr. Scott Rothman ("the Debtor"), a chiropractor. They are Objections to Confirmation of the Debtor's Amended Chapter 13 Plan dated December 24, 1996 ("the Plan"), and Objections to the Amended Fee Application ("the Fee App.") of Koresko & Associates ("Koresko"), the Debtor's counsel, filed by the Standing Chapter 13 Trustee, Edward Sparkman ("the Trustee"), and by an unsecured creditor of the Debtor, Andrew Mozino, as executor of the estate of Joseph S. Mozino a/k/a J.S. Mozino, deceased ("Mozino").

We conclude that both sets of Objections have considerable merit. With respect to the Objections to Confirmation, based principally upon 11 U.S.C. § 1325(b)(1)(B) and focusing on the Debtor's Schedules I and J (Income and expenses, respectively) accompanying the Plan, we find that the Debtor has improperly deducted $427.68 from his monthly wages which are chargeable only to his corporate employer; erroneously included monthly payments of $318 for an automobile loan beyond the maturity date of that loan; and attempted to inequitably attribute $150 of his wife's income to family food expenses. Consequently, unless lower payments will pay all allowable claims filed in this case in full, the Debtor will be obliged to increase his monthly plan payments from $350 monthly to $927.68 monthly for the first 17 months of the plan period, and to $1,245.68 for the remaining 19 months of the plan period.

With respect to the Fee App., requesting $23,402.50, we conclude that, of the services enumerated to date, only approximately $7,500 is potentially compensable as benefitting either the Debtor's estate or the Debtor personally, pursuant to 11 U.S.C. § 330(a)(4). We will refrain from entering any Fee App. order at this time, pending confirmation of a plan, because we cannot truly measure the benefits to either the estate or the Debtor until confirmation occurs. The $7,500 figure is noted only to the extent it is necessary for the Debtor to have some frame of reference in proposing a further amended plan, since the Debtor will receive only one last opportunity to achieve confirmation or suffer dismissal of his case.

### B. PROCEDURAL AND FACTUAL HISTORY

Much of the procedural and factual history of the underlying bankruptcy case and an adversary action instituted by the Debtor against Mozino and his counsel were thoroughly presented in our decisions published as *In re Rothman,* 204 B.R. 143, 147–49 (Bankr.E.D.Pa.1996) ("*Rothman I*"); and *In re Rothman,* 1997 WL 9994, at *1–*3 (Bankr. E.D.Pa. Jan. 7, 1997) ("*Rothman II*"). We will reiterate only those facts necessary to resolve the matters presently before us.

The Debtor filed this case as an individual voluntary Chapter 7 case on March 13, 1996, but converted it to Chapter 13 on March 27, 1996. Mozino's claims against the Debtor stem from a confessed judgment entered against Stoney Creek Bagels, Inc. ("Stoney Creek"), an unsuccessful business venture of the Debtor which was Mozino's former tenant, and the Debtor as party to Stoney

Creek's lease, in the amount of $38,240.00 plus interest and costs. A proof of claim was filed by Mozino in a reduced amount of $17,-840 on September 23, 1996.

Mozino also filed certain objections to confirmation of the Debtor's initial plan on September 23, 1996. Many of these objections are reiterated again, including some disposed of in *Rothman I*, 204 B.R. at 160, but some follow from what appear to be efforts of the Debtor to obfuscate relevant information regarding, *inter alia*, his wages from his self-owned corporate business, Wayne Chiropractic Health Center, Inc. ("Wayne"), and to circumvent our decisions that his expenses for life insurance must be limited and that his wife's income and expenses must be fully considered in his budget. *See id.* at 156–59.

In *Rothman I* we rejected the Debtor's argument that he was not personally liable on Mozino's claim, directed the Debtor to file an amended plan consistent with that decision by January 3, 1997, and rescheduled what we hoped would be a final confirmation hearing on January 30, 1997. *Id.* at 160–61. After a trial on December 18, 1996, of an adversary proceeding brought by the Debtor against Mozino and his counsel, we decided, in *Rothman II*, that Mozino's proof of claim should be reduced to $10,000. 1997 WL 9994, at *7.

From the date of the filing of his original schedules and original plan of reorganization with this court on March 27, 1996, until the date of this Opinion, the Debtor filed numerous amendments to his schedules, matrix, and plan of reorganization, including the following:

a. On May 8, 1996, and June 12, 1996, the Debtor filed an amended schedules F, amended Summaries of Schedules, and amended matrices to add creditors, the latter of which included Mozino.

b. On September 30, 1996, the Debtor filed amended Schedules B, G, and I, an amended Statement of Financial Affairs, and a Declaration Concerning Debtor's Schedules. The schedule amendments were made to "clarify" the Debtor's monthly income, to add a $1 value for Wayne, a $1 value for Stoney Creek, and a $1 value for the Debtor's chiropractic license;

c. The Debtor amended Schedules C, I, and J on November 27, 1996. These amendments added financial information regarding his wife's income and expenses, which increased the total income reported from $3920.00 per month to $4144.86 and expenses from $3770.00 per month to $3994.86. The amendments also added another creditor holding an unsecured nonpriority claim; and

d. Debtor filed the Plan at issue and a further Amended Schedule J on December 26, 1996.

Many of these amendments reflect sloppy original pleadings or necessary accommodations to shortcomings accurately asserted by Mozino.

The instant Plan, filed on December 26, 1996, proposes to pay the Trustee $150 per month until December 1996, then $417 per month until March 1999, an average of $350 for 36 months, for a total of $12,600. The Debtor's original plan, by way of comparison, called for payments of only $150 monthly for 40 months, or a total of $6,600. The distribution of the Plan's payments first references administrative payments totalling $21,983.50 to Koresko, apparently raised to $23,402.50 in the Fee App. before us. Next he proposes to pay an eight (8%) percent fee of $1,008.00 to the Trustee. *But see* 28 U.S.C. § 586(e)(1)(B)(i) (trustee's fee is "not to exceed" ten (10%) percent). Two secured creditors are to be kept current on payments to be made outside of the Plan. The Plan next provides for payment of $280.80 to the Internal Revenue Service ("the IRS") on account of an alleged priority claim primarily against Stoney Creek, although the IRS has not filed any proof of claim in this case. General unsecured creditors filing claims, which include only Mozino and four other parties whose claims total only approximately $5,000, are to receive a *pro rata* distribution of the balance. This provision is illusory, because the Debtor contemplates that after payment of, particularly, Koresko's claim, the pot from which the balance would be paid would be empty.

On January 7, 1997, the Trustee filed Objections to Confirmation of the Plan and the Fee App. Mozino filed Objections to the Plan and the Fee App. on January 13, 1997. The Trustee recites no grounds for his Objections. Mozino's Objections to the Fee App. are very general, contesting specifically only the inclusion of services performed in connection with the separate Chapter 7 case of Stoney Creek. However, Mozino's Objections to Confirmation are very detailed, and include the following:

1. The Debtor improperly included items in his monthly expenses statement, notably $100 a month for life insurance premiums and $306.86 a month for a "contingency reserve."

2. The Debtor has failed to properly allocate expenses attributable to his wife.

3. The Debtor has included payments of $318 per month to General Motors Acceptance Corp. for the installment purchase of a 1992 Chevrolet Astro Van over the life of the Plan even though the vehicle will be paid for in full in August 1997.

4. The Plan fails to attribute any real value to Wayne's stock.

5. The Debtor's monthly income statement recites gross monthly income of $5,590.56 with payroll deductions of $1,670.56. After allowing $427.68 for the employee's share of social security and $156.54 state income tax, the remaining balance of $1,086.34 appears excessive for a person with six exemptions. The Debtor should be required to recalculate his figures to show the proper net income.

Although we conducted the confirmation hearing on January 30, 1997, receiving testimony from the Debtor, we became aware in the course of that hearing that a decision on the Fee App. might be significant to resolution of the confirmability of the Plan. The parties had, however, already agreed to continue the hearing on the Objections to the Fee App. until February 18, 1997. Therefore, we directed the parties to brief the Objections to confirmation in the meantime until that hearing would be held on February 18, 1997.

At the hearing held on January 30, 1997, and in his post-hearing submission, the Debtor stated that he had reduced his monthly payment for life insurance premiums from $350 to $100. He indicated that he had accomplished this by entering into an arrangement with his insurers whereby he will pay $100 a month and the insurance companies will take the remainder of $250 per month from the reserves (savings plans) held by the companies under the Debtor's life insurance policies. He also urged that he be permitted to pay $500 per month to purchase health insurance to cover his family, even though he did not presently and presumably did not in the past maintain such insurance.

The Debtor further argued that he is responsible to pay the employer and employee portions of his payroll taxes because Wayne, which is owned and operated by him alone, is obliged to pay the employer portion of the taxes, and, if Wayne does not pay, he will ultimately be held liable on those taxes to the IRS. Additionally, the Debtor stated that, while he did not indicate on his schedules that his van would be paid for by August 1997, and he listed the van as having a value of $6,000, he believed that its value is actually about $2,000 due to the fact that it has about 100,000 miles on it. Because of these factors, the Debtor submitted that he may need to purchase a new vehicle soon, especially since the family's other car is aging as well, and that he should be permitted to continue to include the $318 payment towards the purchase of a replacement vehicle after August 1997.

The Debtor further stated that his wife's income has been reduced by about one-third since Debtor's bankruptcy schedules were filed because her employer cut her work hours. Moreover, he claimed that virtually all of his wife's income is absorbed by a $154.86 "contribution to food" and $70 "contribution" to purchase clothing. The Debtor became angry and indignant when Mozino pointed out that the Debtor had previously implied that the family's entire $700 monthly food budget was provided from his income, and he never responded coherently to Mozino's questions on this point.

The hearing on the Fee App. was held as scheduled on February 18, 1997. At this hearing Koresko's associate, Jeanne Bonney, Esquire ("Bonney"), testified at some length, attempting to assert that both the Debtor and his bankruptcy estate benefitted from, basically, all of the work that she; the firm's senior member, John J. Koresko, V ("Mr. Koresko"); and an unnamed paralegal performed in connection with this case. She explained that many of the issues raised by Debtor were, in her view, issues of first impression for this court, such as the issue of promoter liability and whether Debtor's signature on the lease entered into with Mozino for the premises leased for Debtor's bagel business made him personally liable on the lease, discussed at length in *Rothman I,* 204 B.R. at 150–56. She also stated that, although her hourly rate was not increased from $150 per hour to $185 per hour until December 1996, the rate charged for all of her time in the case on the Fee App. was $185 per hour.

## C. DISCUSSION

1. *Several of the Objections to Confirmation of the Plan Must Be Sustained, Requiring the Debtor to Substantially Further Increase His Plan Payments.*

The substance of Mozino's Objections to confirmation of the Plan appear to be that the Debtor is not paying nearly all of his disposable income into the Plan, as required by 11 U.S.C. § 1325(b)(1)(B); that Koresko should not be paid such a large priority administrative claim for services which, although they did not benefit the Debtor or his estate, are claimed compensable in a sufficient amount to wipe out payments to general unsecured creditors; and that, in light of these facts and certain alleged discrepancies in the Schedules, such as the listing of Wayne as an asset at a nominal figure, the Plan is violative of the "good faith" requirement of 11 U.S.C. § 1325(a)(3).

■■■ As we noted in *Rothman I,* 204 B.R. at 157, and recently refined in *In re*

*Pellegrino,* 205 B.R. 479, 483 (Bankr.E.D.Pa. 1997), a creditor who files objections to the confirmation of a debtor's plan of reorganization must bear the initial burden of producing evidence that the debtor's plan of reorganization does not contemplate the application of all of his or her disposable income to the plan over the life of the plan. *See also In re Fricker,* 116 B.R. 431, 437 (Bankr.E.D.Pa. 1990); *In re Fries,* 68 B.R. 676, 685 (Bankr. E.D.Pa.1986); *In re Navarro,* 83 B.R. 348, 355 (Bankr.E.D.Pa.1988); and *In re Crompton,* 73 B.R. 800, 808–09 (Bankr.E.D.Pa. 1987).[1] However, after the creditor satisfies this initial burden, the ultimate burden of proof shifts to the debtor. *See Pellegrino, supra,* at 483–84; *Rothman I,* 204 B.R. at 157; *Fricker, supra,* 116 B.R. at 437; *Crompton, supra,* 73 B.R. at 809; and *Fries, supra,* 68 B.R. at 685.

In this case, Mozino satisfied his initial burden of producing evidence that the Debtor's Plan did not contemplate the application of all of his disposable income to the Plan in several respects. Therefore, the burden was cast upon the Debtor to prove that he in fact did satisfy the requirements of 11 U.S.C. § 1325(b)(1)(B) in presenting the Plan.

We note, with considerable dismay, that Mozino and the Debtor have both expanded the disputes between them by regurgitating issues and arguments which we rejected in *Rothman I.* We note that neither *Rothman I* nor *Rothman II* have been appealed, and therefore that *res judicata, see, e.g., In re Taras,* 136 B.R. 941, 946–47 (Bankr.E.D.Pa. 1992); and *In re Laubach,* 77 B.R. 483, 485– 90 (Bankr.E.D.Pa.1987), and the "law of the case doctrine," *see, e.g., Al Tech Specialty Steel Corp. v. Allegheny Int'l Credit Corp.,* 104 F.3d 601, 605 (3d Cir.1997); and *In re Cole,* 89 B.R. 433, 436 (Bankr.E.D.Pa.1988), place all matters decided therein at rest.

For example, Mozino harps on the Debtor's nominal valuation of Wayne and the Debtor's lack of good faith in proposing the Plan. Recognizing Wayne as a separate entity from the Debtor, and for that reason the

---

1. As we noted in *Pellegrino,* at 483 n. 1, our statement in *Rothman I* that a "creditor has the initial burden of *proving*" (emphasis added) its objections to a plan of reorganization, 204 B.R. at 157, was slightly inaccurate, and is to be read in the context of our further enunciations regarding the burden of proof on Chapter 13 confirmation issues in *Fricker.*

valuation of which was relatively insignificant, and that the Debtor's lapses were not indicative of "bad faith," we rejected these arguments in *Rothman I*, 204 B.R. at 160. Nevertheless, they reappear. On the other hand, the Debtor continues to argue that Mozino has failed to meet his "burden of proving" his objections to the Plan and the merits of allowing the Debtor to spend $350 (or more) for life (and now health) insurance just as if *Rothman I, id.* at 156–60, had never been written. We do not intend to take the time to address all of these issues again. Instead, we will confine our discussion to new issues presented by the parties.

One new issue concerns the lack of consideration given by the Debtor to the issue of his car payments. As noted, the Debtor has listed a van, with a value of $6,040, on his Schedule B. He designates the amount of $318 per month for the life of the Plan as a payment for an auto, both in the Plan and its predecessors. However, at trial, the Debtor conveniently testified that the value of the van is now only $2,000 based on the fact that the van has approximately 100,000 miles on it. More significantly, the Debtor has now disclosed that the van will be completely paid off by August 1997. He then contends that he will need to purchase a replacement vehicle, based on the age and number of miles on the van and another aging family automobile, and claims that a perpetual listing of the $318 monthly expenses for payments on a vehicle-payment obligation is justified.

Mozino objects to this expenditure beyond August 1997, contending that it represents a misrepresentation on the Debtor's schedules that he will have to pay $318 per month for the 36–month life of the Plan for the van even though the installment contract to purchase it matures in August 1997. He therefore urges that the Debtor's payments into the Plan should increase by $318 per month, beginning with the Plan payment that will come due in September 1997.

We note that the Trustee, taking the Debtor's part, stated at the hearing that he would not object to the $318 monthly car payment being left on the schedules as is under the circumstances. Nevertheless, we believe that Mozino is justified in raising this objection. Although we have located no cases on point, we note that, due to principles of *res judicata,* Mozino would probably not be permitted to subsequently amend the Plan if the Debtor's payments simply terminated and no new vehicle were purchased as of September 1997 because

> the right of the trustee or the holder of an unsecured claim should be limited to situations in which there has been a substantial change in the debtor's income or expenses that was *not anticipated at the time of the confirmation hearing....* A trustee or unsecured claim holder *may not raise as grounds for modification* under ... section [1329] *facts that were known and could have been raised in the original confirmation proceedings,* because the order of confirmation must be considered *res judicata* as to that set of circumstances.

8 COLLIER ON BANKRUPTCY, ¶ 1329.03, at 1329–5 to 1329–6 (15th ed. rev.) (emphasis added). *See In re Fitak,* 92 B.R. 243, 250 (Bankr.S.D.Ohio 1988), *aff'd,* 121 B.R. 224 (S.D.Ohio 1990); and *In re Gronski,* 86 B.R. 428, 431–32 (Bankr.E.D.Pa.1988).

Mozino has been made aware of the fact that the Debtor's van loan will be paid off in August 1997. Therefore, he had no choice but to now raise his objection to the inclusion of the $318 monthly car payment in the Plan because, under these circumstances, he would not be permitted to raise such an objection after confirmation of the Plan no matter what the Debtor did. Meanwhile, the Debtor might fairly easily modify his plan payments downward if an additional necessary payment for a replacement vehicle becomes necessary. *See id.* at 432 (a debtor has a much broader right to modify a Chapter 13 plan than does a creditor to compel a debtor to make a modification).

We therefore hold that the Plan cannot be confirmed unless the Debtor amends it to add an additional $318 per month of payments to creditors beginning in September 1997, after the maturation of his car loan. This ruling is of course qualified by the observation that, if the Debtor needs to later purchase another vehicle to replace the van,

he may move this court to modify the Plan for that purpose.

■ Mozino also legitimately objects to the amount of money that Debtor has alleged that *he* must deduct from his wages for payroll taxes each month on account of Social Security and Medicare benefits. Mozino urges that the correct percentage is 7.65%, the employees' share, while the Debtor argues that he will need to pay double that amount, the employee *and* employer shares, totalling 15.3% of his wages, for these purposes. The Debtor justifies his proposed double deduction by alleging that he may be liable for the employer's share because he is the sole shareholder of Wayne and would be a "responsible party" if Wayne failed to pay the employer's share.

We note, however, that, on one hand, the Debtor urges that the accounts receivable and value of Wayne are not his personal assets because they are the assets of the corporate entity and not his own. We have sustained that position in rejecting Mozino's argument that the Debtor's arguably misleading disclosure of his interest in Wayne was relatively insignificant and did not constitute "bad faith." *See* pages 105–06 *supra.* On the other hand, the Debtor, for other purposes, is quite willing to have this court consider the liabilities of Wayne, *i.e.* the payroll taxes, to be his own personal responsibility.

The Debtor is correct in stating that, if Wayne does not pay the payroll taxes due on his wages, he, as sole shareholder of the corporation, will most likely be held ultimately liable for any payroll taxes not paid by Wayne Chiropractic pursuant to 26 U.S.C. § 6672(a). *See, e.g., Muck v. United States,* 791 F.Supp. 817 (D.Colo.1992), *aff'd,* 3 F.3d 1378 (10th Cir.1993) (president and sole shareholder of corporation had sufficient control over the financial affairs of the corporation to render him personally responsible to collect and pay the corporation's wage withholding taxes); *In re Thomas,* 187 B.R. 471, 475–76 (Bankr.E.D.Pa.1995) (accountant of corporate business held personally liable for unpaid withholding taxes of business); *In re Abel,* 162 B.R. 993 (Bankr.E.D.Pa.1994), *rev'd on other grounds,* 200 B.R. 816 (E.D.Pa.1996) (secretary who was also 50% shareholder in corporation qualified as "responsible person" who may be responsible to pay corporation's portion of employee withholding taxes); *In re Green,* 89 B.R. 466, 472–78 (Bankr.E.D.Pa.1988) (corporate president held liable for withholding taxes due from his business); and *In re Myers,* 36 B.R. 56 (Bankr.D.Idaho 1984) (since the debtor and his wife who were sole stockholders of corporation, the debtor was personally liable for paying trust fund taxes of corporation which were not paid by the corporation).

However, Wayne is primarily responsible to pay those payroll taxes as the employer of Debtor. Any liability of the Debtor for these sums is not only speculative and highly contingent, but also we note that the contingency is one over which the Debtor maintains the full power to prevent. Moreover, there is no allegation that Wayne has not at all times made these payments. We therefore presume that Wayne has properly deducted the necessary sums and that no contingent liability of the Debtor for this sum will arise. It would be most inequitable to have this court permit the employer portion of the Debtor's payroll taxes to be designated as his personal liability on the assumption that the corporation, through him, will violate the law and not pay the full amount of its payroll taxes. At present, the Debtor bears no liability for the payment of the payroll taxes and will have no liability unless and until Wayne fails to pay them.

Accordingly, Mozino's objection on this ground is sustained. As noted, this objection has substantial financial consequences because it increases the Debtor's net income by $427.68 monthly, all of which must now be paid into the plan.

One additional objection of Mozino to confirmation of the Plan which bears significant economic consequences has merit. The Debtor, it will be recalled, initially failed to list his wife's income. When he amended Schedule I to add his wife's income of about $225.00 monthly, he followed this with the filing of an amended Schedule J reciting that about $155 of this income was spent as a contribution to food and about $70 was spent as her contribution to her clothing. Mozino,

quite understandably, contends that the amendments to Schedule J are merely a subterfuge by which the Debtor hoped to avoid accounting for his wife's income. The evidence presented supports Mozino's contentions in this regard.

The Debtor consistently indicated in his bankruptcy Schedules that *he* spends $700 per month for food for his family of six, which includes his wife and children aged 12, 11, 10, and 6 years. Prior to disclosing his wife's income, no allegation was made that the entire food costs for the family exceeded $700 monthly, which is quite liberal considering that the Debtor's children are all quite young. When confronted with these facts, the Debtor expressed anger, possibly attributable to guilt at the frustration of his attempted subterfuge, and no logical explanation whatsoever. It is therefore our conclusion that the Debtor's original figure of $700 per month for all food expenses for the family is more likely to be an accurate figure representing the amount of money spent each month on food for the *entire* family than the $850 figure including the wife's alleged food expenditures. Consequently, we agree with Mozino that the Debtor has not properly allocated expenses attributable to his wife. While the Debtor testified, without documentary support, that the wife's income has declined, this is not reflected on Schedule I. We conclude that $150, a low estimate of the wife's net monthly earnings, represents disposable income available to the Debtor for which he has not properly accounted.

We therefore conclude that the Debtor must pay $150 more monthly into the plan, in addition to $427.68 due to unaccounted deductions from his wages, added to the $350 excess income reflected on the Debtor's most recent Schedule J. This requires a payment of $927.68, beginning in April 1996, in order that the Plan will comply with § 1325(b)(1)(B), through August 1997, or for 17 months. Beginning in September 1997, the Debtor will be obliged to add another $318 monthly, bringing the minimum permissible payment to $1,245.68 for the 19–month remaining minimum plan period. The Debtor may therefore be obliged to contribute a total of $39,438.48 over the minimum 36–month period in order to submit a plan in compliance with § 1325(b)(1)(B), unless submission of a lessor sum is sufficient to pay all creditors in full.

Mozino has raised additional objections to confirmation, but we do not believe that any of them have merit. Also, we reject the Debtor's contention that his income is overstated or that his expenses are understated because they fail to include a $500 monthly expenditure for health insurance for his family. All of these further issues merit only brief discussions.

■ The first objection raised by Mozino which lacks merit is his claim that the Debtor's residual $100 monthly expenditure for life insurance is impermissible under § 1325(b)(1)(B). In *Rothman I*, 204 B.R. at 157–59, we determined that the Debtor's previous plan could not be confirmed because it provided that $350 monthly would be expended for life insurance premium payments. However, we expressly stated that we did not object to a debtor's spending a "reasonable amount" on life insurance, *id.* at 159; we found only that $350 monthly was excessive. In so holding, we expressed concern that part of the insurance payment was on account of a savings plan and that it was inequitable for the Debtor to pay far more monthly on life insurance than he proposed to pay to his creditors. *Id.* at 158–59.

The Debtor, implicitly conceding that part of the insurance payment was for a savings component, has now filed the Plan, which designates that the Debtor must still pay the same $350 per month premium, but only $100 of which will come directly out of his own pocket. The remaining $250 per month will be deducted by the insurers from the reserves built up by the Debtor's two insurance policies.

Applying the same principles developed in *Rothman I*, we determine that a payment of $100 per month in life insurance premiums is not luxurious nor excessive, particularly since the Debtor has a wife and four young children who would need to be provided for should he predecease them. The wife has a modest income which would clearly not be

sufficient to support herself, not to mention four children in addition.

■ On the other hand, we do not agree with the Debtor when he argues that his disposable income is overstated because he "needs" to buy health insurance at a cost of $500 per month for his family. We note that the Debtor is a doctor himself and that he has not proven that he ever previously felt it necessary to purchase medical insurance for his family. Since the Debtor did not have any health insurance for his family in the past, it is difficult to understand how there could be such an urgent need for such insurance now. Moreover, he has not undertaken to prove the actual cost of such insurance, apparently presenting the $500 figure as his estimate of the cost.

However, even if the Debtor could have proven that he had medical insurance in the past at $500 monthly, we would nevertheless be reluctant to allow such a large expenditure for an item which does not appear to be necessary and takes the place of payments to creditors. In other words, the same reasoning that caused us to conclude that $350 was simply too much for life insurance would cause us to conclude that $500 monthly for medical insurance appears to be a luxury which a Chapter 13 debtor, especially one whose family has indicated no special needs, must simply forego as an aspect of "belt tightening."

■ Mozino also takes issue with the Debtor's retention of what appears to be designated as a $306.86 "contingency reserve" in the Plan, pointing out that predecessor plans contained only a $32 "contingency reserve." First, we note that $224.46 of what appears to be a contingency reserve is in fact meant to be designated as the contributions of the Debtor's wife, leaving only $82.40 as a contingent reserve.

We further find that debtors are generally permitted to maintain a contingency fund of money which they may use at their discretion and which will not be figured into specific expenses in their budgets or plans of reorganization. As the Debtor correctly pointed out, contingency funds of $92.16 per month for a family of five in *Fries,* and $97.63 per month for a family of three in *Crompton,* have been approved by courts in this jurisdiction. In this case, the Debtor's family consists of two adults and four children. It does not appear that a contingency fund of $82.40 is excessive. *But see Rothman I,* 204 B.R. at 159 (a substantial portion of the Debtor's $350 monthly life insurance expenditure cannot be justified as a "contingency reserve").

We previously noted that Mozino reiterates the contention that the Plan violates the "good faith" requirement of 11 U.S.C. § 1325(a)(3), which we disposed of in *Rothman I,* 204 B.R. at 160. Therein, citing *In re Lilley,* 201 B.R. 725, 728–29 (Bankr.E.D.Pa. 1996), *on remand from In re Lilley,* 91 F.3d 491 (3d Cir.1996), we noted that misconduct in this bankruptcy court itself was the normal polestar of § 1325(a)(3). While we continue to be disturbed at the Debtor's stubbornness, attempts at low-level subterfuge, and occasional apparent refusal to accept the effect of our unappealed orders, we refuse to find this conduct to exist at the level necessary to trigger § 1325(a)(3).

We therefore reject all of Mozino's objections except those sustained at pages 105–07 *supra,* just as we declare the Debtor's efforts to undercut the result of these rulings unavailing.

2. *Koresko's Fee Application Justifies Compensation of No More than Approximately $7,500, and Even this Figure Is Contingent upon Confirmation of a Plan.*

Koresko's original Fee App. was filed on December 26, 1996, and requested compensation in the amount of $20,484.50 for all legal services provided to the Debtor by it in connection with this case, including many hours litigating the Debtor's Objections to Mozino's proof of claim ("the Objections"); the adversary proceeding against Mozino and his counsel ("the Proceeding") to that same end of attacking Mozino's claim; and the Objections of Mozino and the Trustee to the Confirmation of the Debtor's plans. Koresko's response to the Objections thereto was to file the Amended Fee App. on February 7,

1997, *increasing* the total amount sought to $23,402.50.

Although the objections to the Fee App. are generalized and fail to raise the specific issues discussed herein, this is of no moment. The Third Circuit Court of Appeals has held that bankruptcy judges have not only the power but also the duty to review all fee applications and raise any objections to the amounts sought therein *sua sponte. In re Busy Beaver Building Centers, Inc.,* 19 F.3d 833, 841 (3d Cir.1994). *See also In re Quaker Distributors, Inc.,* 189 B.R. 63, 68 (Bankr. E.D.Pa.1995); and *In re Dubin Paper Co.,* 169 B.R. 115, 122 (Bankr.E.D.Pa.1994). The *Busy Beaver* court, in so holding, stated that "the bankruptcy court must protect the estate, lest overreaching attorneys or other professionals drain it of wealth which by right should inure to the benefit of unsecured creditors." 19 F.3d at 844.

The statutory framework for our decision is 11 U.S.C. § 330(a)(4), which was added to the Bankruptcy Code among very substantial 1994 additions to § 330 of the Code and reads as follows:

(4)(A) Except as provided in subparagraph (B), the court shall not allow compensation for—

(i) unnecessary duplication of services; or

(ii) services that were not—

(I) reasonably likely to benefit the debtor's estate; or

(II) necessary to the administration of the case.

(B) In a chapter 12 or chapter 13 case in which the debtor is an individual, the court may allow reasonable compensation to the debtor's attorney for representing the interests of the debtor in connection with the bankruptcy case based on a consideration of the benefit and necessity of such services to the debtor and the other factors set forth in this section.

In attempting to analyze the Koresko Fee App., we initially indicate our intention to disallow compensation for certain activities which we found to have been poorly described or insufficient to support the compensation requested. Then, we have broken down all of the remaining services provided into the following five categories:

1. General bankruptcy services;

2. Services mainly related to objections to plan confirmation;

3. Services mainly related to the Debtor's objections to Mozino's proof of claim;

4. Services mainly related to the Proceeding brought by the Debtor against Mozino and his counsel; and

5. Preparation of fee applications.

The three Koresko professionals identified as providing services to the Debtor in this case are Mr. Koresko, the founding partner of the firm, charging a rate of $225/hour; Bonney, who charged a rate of $185/hour; and an unidentified paralegal, charging a rate of $60/hour. Our analysis of the breakdowns of services in each of those categories is as follows:

| Category No. | Paralegal hrs. | Bonney hrs. | Koresko hrs. | Value |
|---|---|---|---|---|
| 1 | 5.75 | 18.25 | –0– | $3,721.25 |
| 2 | 1.05 | 2.1 | 30.2 | 7,248.50 |
| 3 | 1.2 | 1.6 | 24.7 | 6,188.50 |
| 4 | 4.1 | 15.5 | 6.5 | 4,586.00 |
| 5 | .45 | 3.1 | .75 | 769.25 |

Our first adjustment relates to the hourly rates charged. Reviewing the propriety of counsel's hourly rates is part of the duty and power entrusted to us in *Busy Beaver. See Dubin Paper, supra,* 169 B.R. at 121–22.

Koresko was admitted to the bar in 1983 and Bonney in 1984. Despite having at best a middle range of experience, the hourly rates charged by both are high by the standards of the consumer bankruptcy bar.

All of the trial work was done by Koresko. Bonney has never, to our knowledge, appeared in our courtroom as an advocate. We are dismayed that Bonney would have considered it appropriate to bill all work on the Debtor's case at $185/hour because her rate was raised to $185/hour in December 1996, shortly before the Fee App. was filed. We find the hourly rate of $150, though still on the high side for an associates who performs no trial work, to be a far more appropriate measure of her market value than $185. We will compensate her for services in this case at no more than $150 per hour.

The delegation of the trial work to Mr. Koresko justifies a somewhat higher hourly rate in his case than is payable to Bonney, even though their legal experience is almost identical. However, we do not find the competency level of his services, which tend to show questionable judgment in choosing issues on which to fight, to rise to that of attorneys of like experience in *Dubin Paper, supra,* 169 B.R. at 117, who were allowed rates of $200 to $210 per hour. We will allow Koresko to be compensated at no more than $200 per hour.

We will allow the anonymous paralegal's hourly rate at $60, even though we know nothing about this person's level of expertise or even his or her identity.

Prior to the 1994 amendments adding § 330(a)(4), attorneys in Chapter 13 cases were permitted to receive compensation for only those legal services compensable against a debtor's estate generally, *i.e.,* those that benefitted the debtor's bankruptcy estate. *See In re Gage,* 164 B.R. 756, 758 (D.S.D. 1993); *In re Brandenburger,* 145 B.R. 624, 628 (Bankr.D.S.D.1992); and *In re Malewicki,* 142 B.R. 353, 356 (Bankr.D.Neb.1992). *Cf. In re Cohen,* 1997 WL 47623, at *2 (Bankr.E.D.Pa. Feb. 3, 1997). Any legal fees that were incurred for services which benefitted only the debtor could not be paid from the bankruptcy estate, but rather remained the personal liability of the debtor. The amendment to § 330 reflected in § 330(a)(4)(B) broadened the beneficiaries of legal services compensable from the debtor's estate to the debtor as well, but nevertheless underscored that services compensable for the debtor's estate must benefit either the debtor or the estate.

■■■■ The determination of precisely what constitutes reasonable compensation for actual, necessary expenses under § 330(a)(4) is within this court's sound discretion. *See In re Breeden,* 180 B.R. 802, 808 (Bankr. N.D.W.Va.1995). In making this determination, this court must make an independent evaluation and need not look to state law. *Unsecured Creditors' Committee 82–00261C–11A v. Walter E. Heller & Co. Southeast, Inc.,* 768 F.2d 580, 585 (4th Cir.1985); and *Breeden, supra,* 180 B.R. at 808. The burden of proving that the compensation requested by counsel is reasonable and that the services provided by counsel were actual and necessary falls on the attorney requesting the fees. *Breeden, supra,* 180 B.R. at 808. *Cf. In re Metro Transportation Co.,* 78 B.R. 416, 420 (Bankr.E.D.Pa.1987), *remanded,* 107 B.R. 50 (E.D.Pa.1989).

In discussing the compensation generally deemed appropriate for debtors' counsel in Chapter 13 cases, we have observed that the appropriate measure is determined by "ascertainment of what an informed client and an informed attorney would agree should be paid for certain services. If the marketplace naturally establishes a price for a service, then we believe that it is logical to assume that this is the figure to which an informed client and an informed attorney would agree." *In re Patronek,* 121 B.R. 728, 731 (Bankr.E.D.Pa.1990). In *Patronek,* we concluded that the fees charged by attorneys in typical consumer Chapter 13 cases in this jurisdiction at that time was between $700 and $1,200. *Id.* at 733. *See also In re Fricker,* 131 B.R. 932, 942 (Bankr.E.D.Pa. 1991). This figure has risen over time, but most attorneys do not presently charge in excess of $1,500 to represent debtors in such cases.

■■■ The instant case is clearly atypical. The Debtor would attribute this "irregularity" to Mozino's excessive opposition to his efforts. However, while it is true that Mozino has occasionally displayed excess in his advocacy, it is also true that the Debtor, by his counsel, has displayed lapses of judg-

ments, stubbornness, and combativeness (as reflected in his joining Mozino's counsel as defendants in an adversary proceeding) which has caused Mozino to dig in and become entrenched in his opposition. We cannot indulge the Debtor's wrongful impulses. Bonney testified, for example, that Koresko pursued the Proceeding through trial at the insistence of the Debtor. The Debtor cannot be permitted to act out his litigious impulses at the expense of the creditors of the Debtor's estate.

We also must emphasize that it is our policy not to award compensation in Chapter 13 cases unless and until a Chapter 13 plan is confirmed or the case is dismissed or otherwise terminated. *See Fricker, supra,* 131 B.R. at 938–39. Therefore, at this juncture, we are not prepared to enter any final award of compensation. This is especially so because it is uncertain just what benefits to the Debtor's estate or the Debtor individually will inure as a result of Koresko's services. Rather, we will estimate what it appears that this compensation should be, on the assumption that a plan consistent with this Opinion is confirmed, for purposes of guiding the Debtor and other interested parties. In that way, we will avoid the "Catch 22" of being unable to confirm a plan because of uncertainty over compensation due to Koresko, but being unable to make an award to Koresko because of uncertainty regarding plan confirmation.

Referencing the five categories of services recited at page 109 *supra,* we predict that only the first category of services will ultimately be found to totally meet the criteria of benefitting the interests of the Debtor's estate or the Debtor. Adjusting the compensation which we estimate will be payable in light of our reduction of Bonney's hourly rate results in our estimated calculation that Koresko will be entitled to $3,079.50 for such services.

It is more difficult to estimate the benefits to the estate or the Debtor conferred by services in the third and fourth categories. We find that it is likely that only limited benefits will be proven to have been derived from any of these services to either the estate or the Debtor and that, at most, the value of same lies in the $2,500 range.

It appears unlikely that the estate will receive any benefit from the Debtor's litigation with Mozino. The fact that it allegedly raised issues of first impression, although we would submit that the pertinent law was well settled by the Pennsylvania appellate courts prior to our decision, is irrelevant. The important fact is that, to date, that litigation has not resulted in any increase in dividends to unsecured creditors. In fact, a comparison of the modest dividends payable to unsecured creditors under the terms of the Debtor's original plan to the elimination of any dividends payable to such creditors under the terms of the present Plan reveals that the estate has lost ground as a result of this litigation. Similarly, it is difficult to perceive any benefit to the Debtor when the present Plan calls for him to make a larger total payments than its predecessor.

Under certain scenarios, there is a possibility that the estate or the Debtor will realize some benefit from these services. The net potential benefit arises from our *Rothman II* decision reducing Mozino's claim from $17,840 to $10,000. It is possible that this reduction will increase the dividend to unsecured creditors or reduce the Debtor's plan payments necessary to pay all unsecured creditors in full.

However, Koresko's fee request for these services exceeds $10,700. It can be fairly easily assumed that no more than about one-third of the $7,840 benefit to the Debtor or the estate, or about $2,500, will be allowed to Koresko for such services under any circumstances.

In our view, the "services" reflected in Koresko's pursuit of its own fee application are of no benefit to either the estate or the Debtor individually. The more that is payable to Koresko, the less that will be available for distribution to either the Debtor or his estate. Also, we note "the long-standing principle" adhered to by most judges in this court that time expended by professionals in pursuit of fee applications is generally not compensable from the debtor's estate. *See, e.g., In re J.A. & L.C. Brown Co.,* 75 B.R. 539, 540 (E.D.Pa.1987); *In re Jefsaba,*

*Inc.*, 172 B.R. 786, 801–02 (Bankr.E.D.Pa. 1994); *In re Rheam of Indiana, Inc.*, 111 B.R. 87, 102 (Bankr.E.D.Pa.1990), *aff'd in part & vacated in part*, 133 B.R. 325 (E.D.Pa.1991), *on remand*, 137 B.R. 151 (Bankr.E.D.Pa.), *vacated*, 142 B.R. 698 (E.D.Pa.1992); and *In re Shaffer–Gordon Associates, Inc.*, 68 B.R. 344, 348–50 (Bankr. E.D.Pa.1986).

The final category, the collectability of which is not easily resolvable at this juncture, is the second category, concerning services in connection with objections to confirmation by Mozino and the Trustee. Koresko was at least partially successful in fending off these attacks. The unsuccessful efforts did not benefit either the estate or the Debtor individually. The successful defenses did not benefit the estate, *see Gage, supra*, 164 B.R. at 758, although they probably did benefit the Debtor. As matters stand now, we doubt that more than $2,000 worth of services could be said to have garnered sufficient success as to be deemed beneficial to the Debtor individually.

However, even that benefit will be contingent upon confirmation of a plan. Therefore, as in our discussion of the fees requested for services in opposing Mozino's claim, we can only state a figure of $2,000 which appears potentially payable to Koresko.

Thus, we conclude that a fee of no more than about $7,500 appears potentially payable to Koresko from the Debtor's estate for all services performed in this case under 11 U.S.C. § 330(a)(4). In light of our prior conclusion that the Debtor will have to make payments of no less than $39,438.48 to achieve confirmation, it appears that, contrary to the Debtor's hypothesis in making argument on the matters at issue taken together, a substantial dividend will be payable to unsecured creditors after Koresko's allowable fee application is paid. In fact, the Debtor may be able to pay a reasonable fee to Koresko, pay all unsecured creditors in full, and be left with a surplus. This would reduce the gross payments that he would be obliged to submit. For example, the Debtor would be obliged to pay only about $26,000 to pay all unsecured creditors, including Mozino, in full ($15,000 +), Koresko's reasonable

fee ($7,500 +), and the Trustee's commission ($2,500 +).

## D. CONCLUSION

In addition to reciting the conclusions reached in this Opinion, our within order provides but one more chance for the Debtor to prepare a confirmable plan, in conformity with the conclusions reached herein and in *Rothman I* and *Rothman II*. The order accompanying *Rothman I* contemplated no more than a limited number of additional chances to the Debtor to achieve confirmation. The Debtor has received significant guidance as to what is required of him to achieve confirmation. He must now conservatively prepare a plan in conformity with this guidance or suffer dismissal of his case.

We note that the case was filed almost a year ago and confirmation has now been continued three times. We will require that an amended plan be filed and served by March 17, 1997, and be confirmed by April 15, 1997, or this case will be dismissed.

## ORDER

AND NOW, this 10th day of March, 1997, after a hearing of January 30, 1997, in reference to Objections of the Estate of Andrew L. Mozino, as executor of the estate of Joseph S. Mozino a/k/a J.S. Mozino, deceased ("Mozino"), and of the Standing Chapter 13 Trustee, Edward Sparkman, Esquire ("the Trustee"), to confirmation ("the Confirmation Objections") of the Debtor's Amended Chapter 13 Plan ("the Plan"), and a hearing of February 18, 1997, on the Objections of Mozino and the Trustee to the Application for Approval of Counsel Fees by Koresko & Associates, as amended ("the Fee Application Objections"), and the respective submissions and arguments by interested counsel, it is hereby ORDERED AND DECREED as follows:

1. The Confirmation Objections are SUSTAINED in substantial part and DENIED in part, as reflected in the within Opinion.

2. Confirmation of the Plan is DENIED.

3. The Fee Application Objections are SUSTAINED in part, as reflected in the within Opinion. Although this court has pro-

vided an estimate of the potentially allowable fees, it is premature to enter any fee award prior to confirmation of a plan in this case.

4. The Debtor shall resolve all outstanding impediments to Confirmation, including those identified in the foregoing Opinion, by filing and serving an Amended Plan in all respects consistent with this Opinion and the prior decisions rendered in this case, as well as making any other filings necessary to achieve confirmation, on or before March 17, 1997, or this case will be dismissed.

5. A final hearing to consider confirmation and dismissal of this case is scheduled on

TUESDAY, APRIL 15, 1997, at 9:30 A.M.

and shall be held in Courtroom No. 1, United States Bankruptcy Court, 900 Market Street, Philadelphia, PA 19107.

6. No continuances of the aforementioned confirmation hearing will be permitted, and this case will be dismissed on April 15, 1997, if a plan cannot be confirmed on that date.